BAR ASSOCIATION OF THE CITY OF BOSTON *vs.* WILLIAM
P. HALE.

Suffolk.    January 8, 1908. — February 27, 1908.

Present: KNOWLTON, C. J., LORING, SHELDON, & RUGG, JJ.

*Attorney at Law*, Disbarment.    *Words*, " Misconduct."

A material question at the hearing on a petition for the disbarment of an attorney
at law was whether a charge of $3,600 made by the attorney to a client for
services was proper.    The respondent was employed by the client, a married
woman, to obtain for her either separate maintenance or a divorce from her hus-
band, and had paid nothing to the respondent as a retainer or on account of
disbursements to be made, although she gave him security worth $250.    The
respondent testified that he spent one hundred and fifty-four days of six hours
each on the case during a period of two years, and that finally by the use of de-
tectives he procured evidence of adultery on the part of the client's husband and
other evidence by the use of which he was able to compel the father of the
client's husband, the husband being without financial resources, to pay to the
client $7,700 and to undertake to maintain and educate the client's two minor
children, and also was able to procure a divorce without a contest.    He further
testified that the case was unusually difficult because of habits of drinking and
of resorting to questionable places on the part of the client, and it appeared in evi-
dence that, when complaint was made to a committee of the bar association by
the client, the respondent, in order to prevent proceedings, threatened that he
would make public certain misconduct (meaning sexual immorality) of hers.
The client testified that she did not drink to excess and that she was not guilty
of misconduct.    Witnesses, qualified as experts, testified that in their opinion the
charge of the respondent for his services as stated by him was reasonable.    The
presiding judge found that the charge was unreasonable and excessive.    *Held,*
that the presiding judge was not bound to believe the evidence produced by the
respondent, and that the finding would not be disturbed.

A finding by the judge presiding at the hearing of a petition for the disbarment of
an attorney at law, that a promissory note given by a woman client to the
respondent, while the confidential relation of attorney and client still existed,
in payment of his charge for services already rendered by him, was not pro-
cured by the respondent with the fraudulent intent of obtaining money from
her under the pretence that it was due to him for services, does not preclude
the presiding judge from finding that the charge for services was unreasonable
and excessive and that the respondent was guilty of unprofessional conduct in
making it.

Where evidence introduced at the hearing of a petition for the disbarment of an
attorney at law tends to show that, after a complaint to the grievance com-
mittee of a bar association by a woman who was a client of the attorney and
had been charged an excessive and unreasonable fee for services by him,
the attorney had interviewed the secretary of the committee and then had writ-
ten to the client that, if she did not retract her statement that he had procured

from her a note for the amount of the services by fraud, he would "make a statement of the increased difficulties I had in handling your affairs owing to your own misconduct," and that he also had made a similar statement to the secretary as to the client's "misconduct," but that the client had been guilty of no misconduct and that the attorney had no evidence of any, findings by the presiding judge that by "misconduct," the attorney meant "sexual immorality," and that the attorney was guilty of unprofessional conduct in making the threat were warranted.

PETITION for disbarment filed in the Superior Court for the county of Suffolk January 11, 1907.

After the petition was filed, Arthur D. Hill, a member of the bar, was authorized by the presiding judge to prosecute the inquiry and proceedings in relation to it.

The specific allegations of the petition with regard to misconduct on the part of the respondent were as follows:

"3. In or about the year 1904, at some time not precisely known to your petitioner, one Gertrude S. Brackett, wife of one Arthur L. Brackett, employed the respondent to represent her as an attorney at law in divorce proceedings which she was then contemplating taking against her said husband.

"4. On or about April 12, 1906, a libel for divorce was filed in the Superior Court for the county of Suffolk by said Gertrude S. Brackett. The said libel was not contested and, after hearing by the court, a decree *nisi* was entered therein on or about May 18, 1906, which decree became absolute on or about November 18, 1906. The respondent appeared as attorney at law for the libellant in the said proceedings, including the hearing therein. Your petitioner is informed and believes that certain facts, which, if known to the court, would have prevented the granting of a divorce to the said Gertrude S. Brackett, were known to the respondent at the time of and prior to the hearing on the said libel, and that the respondent, contrary to his duty as an attorney at law, neglected to inform the court of such facts and concealed their existence from the court, thereby practising a fraud upon the court and obtaining for the said Gertrude S. Brackett a decree of divorce to which she was not legally entitled

"5. On or about April 13, 1906, immediately after the filing of the libel in the said divorce proceedings, a written agreement was made between the said Arthur L. Brackett, one Walter M.

Brackett, his father, and the said Gertrude S. Brackett. . . .
On the same day the sum of $1,700 was paid to the said Gertrude S. Brackett by the said Walter M. Brackett or by some other member of the family of the said Arthur L. Brackett on account of alimony. From this sum the said Gertrude S. Brackett then paid $1,000 to the respondent on account of services and expenses. On or about the same date, the respondent procured and persuaded the said Gertrude S. Brackett to sign two other papers, one a promissory note for $3,100, payable to the respondent with interest at four per cent; the other an assignment of the $6,000, referred to in the said agreement, as security for the payment of the said promissory note. The said Gertrude S. Brackett was a woman unfamiliar with business and inexperienced in the conduct of business affairs, and the respondent did not properly explain to her the nature and the legal force and effect of the papers signed by her and wilfully left her in ignorance of what she had done. Your petitioner is informed and believes that in so doing the respondent acted with the fraudulent intent of obtaining money from her under the pretence that the same was due him for services and expenses in the said cause.

" 6. Subsequently the respondent, in pursuance of the fraudulent intent stated in the last section of this complaint, collected and received the said $6,000 and interest thereon, which, together with the said sum amounted to $6,142, by means of the said note and assignment, and procured and applied the sum of $3,174.36 from the same to the payment of the said note and the assignment under the pretence that same was due him for professional services and expenses in the said divorce proceedings, whereas, in truth and in fact, no sum was then so due him, or, if any sum was so due, it was much less than the amount which he so applied from the moneys so collected and secured by him.

" 7. In or about the month of November, 1906, the said Gertrude S. Brackett made complaint of the conduct of the respondent to Charles E. Shattuck, Esq., then the secretary of the grievance committee of your petitioner, of which complaint the respondent then or shortly afterward had notice. The respondent, in order to prevent the said Gertrude S. Brackett from taking any further proceedings against him before the

grievance committee of your petitioner, caused or attempted to cause the said Gertrude S. Brackett to be notified that if she proceeded farther with her complaint against him before the grievance committee and unless she abandoned the same, that he would cause certain alleged misconduct of her, the said Gertrude S. Brackett, to be made public and would thereby injure her character and reputation in the opinion of persons known to her."

There was a hearing upon the petition before *Fessenden,* J. The following facts were undisputed: In the fall of 1904 Gertrude S. Brackett, wife of Arthur L. Brackett, asked Herbert T. Lane, Esquire, if he knew the respondent, and he said that he knew him and that he knew nothing whatever against him. She therefore consulted the respondent and employed him to procure for her either separate maintenance or a divorce from her husband. It was necessary to employ several detectives to watch Brackett, and it was not until March 23, 1906, that evidence was discovered upon which a divorce libel was brought, adultery being alleged. Brackett was a man of no means, but his father had property, and, by contending that the father had alienated Brackett's affections from his wife, the respondent induced the father and Brackett to sign an agreement on April 13, 1906, by the terms of which $1,700 was paid forthwith to the respondent for his client, provision was made as to the custody and maintenance of two children, and it was agreed that some furniture should be delivered to her and that $6,000 should be deposited in a bank in Manchester, New Hampshire, of which the respondent's brother was vice-president, to be paid to Mrs. Brackett upon her procuring a decree absolute of divorce. This agreement was signed in the office of the attorney of Brackett and his father, and immediately thereafter Mrs. Brackett had an interview with the respondent in his office at which she signed a note payable to his order for $3,100, and an assignment of the sum in the bank as security for the note, and paid him out of the $1,700 just received by him $1,000 on account of services and to cover disbursements amounting to $500 made by him in her behalf. (The testimony with regard to this interview will be given in more detail below.) A decree absolute of divorce was granted to Mrs. Brackett on November 19, 1906. On the

following day the respondent wrote to her: "Your divorce became absolute yesterday and the deposit of $6,000 was sent me with interest, $6,142.00, and I am ready to turn over the balance to you after satisfying my note, or to retain your part as an investment for you if you wish."

On November 23, Mrs. Brackett made to Charles E. Shattuck, Esquire, secretary of the grievance committee of the petitioner, a complaint against the respondent. Mr. Shattuck communicated with the respondent on November 24, which was Saturday, and on that same day the respondent went to the office of Mr. Lane and had an interview with him. The respondent's testimony with regard to that interview was as follows: "I went to Mr. Lane's office and went into his private office and said to him, 'Mr. Lane, as a friend of Mrs. Brackett I want you to take a messege to her from me.' He said, 'I am not a friend of Mrs. Brackett; my wife is a friend of Mrs. Brackett.' I said, 'Well, possibly you know of a complaint that she has made to the Bar Association of me.' He said he did not. He asked me what I had charged Mrs. Brackett and what she got out of her case. I told him that I could not tell him that. I then said, 'I have come here to ask you just one thing. I want you to say to her that, if she insists upon her complaint, statements will have to be made which will embarrass her and her friends,' and he said 'What statements? Statements reflecting upon her character?' and I said, 'Yes.' He said, 'What friends?' I said, 'I cannot state that to you, sir.' He said, 'Why not? On account of her privilege?' I said, 'There are other excellent reasons why I cannot state that to you and I have come to you.' He said, 'How can you prove this?' He asked if I had any writings or letters or anything. I said, 'I have a letter which would substantiate much of what I might say, perhaps.' He then asked me again if I would state to him what the facts were, and I told him it was impossible for me to do so. He said he doubted whether he could take that message because he was not a friend of hers himself, and it might be a little embarrassing. I said, 'Very well, she will understand it if you care to take it and I do it for her benefit.'"

On the following Monday, November 26, the respondent wrote to Mrs. Brackett: "I have delayed sending you cheque for the

balance of $6,142.00 in my hands pursuant to our settlement only because I thought you might wish to leave the money in my hands for investment as you thought likely last spring.

"Your complaint to the Bar Ass'n, (made known to me Sat. 24th. Nov.) affords no reason why I should delay sending this balance $2,967.64 stated below.

"I requested Mr. Lane Saturday, to inform you that if you do not retract your false statement to Mr. Shattuck to the effect substantially that I obtained your note and assignment by fraud I shall make statement of the increased difficulties I had in handling your affairs owing to your own misconduct so frequently the subject of consultation as you know. I hesitated to do so Saturday because I do not desire to embarrass others; but if you do not correct your false charges, I shall not leave Mr. Shattuck in any doubt as to you nor without explanation of the size of my fee."

The statement accompanying the letter was as follows:

| " Deposit $6000 with int. | | | $6142. |
|---|---|---|---|
| Note April 13th, '06 | | $3100.00 | |
| Int. same to Nov. 19th | | | |
| | 4% | 74.36 | |
| Cheque herewith, | | 2967.64 | |
| | | 6142.00 | $6142.00 " |

On the same day the respondent wrote to Mr. Shattuck a letter containing the statement that he had sent Mrs. Brackett the balance of $2,967.64, and had written her "that if she does not retract her false charges as to the note and assignment I shall state the increased difficulty I had in the matter owing to her own misconduct, not leaving you in doubt as to her nor without explanation of the size of my fee."

There was a hearing before the grievance committee of the petitioner on the complaint made by Mrs. Brackett, as to which hearing Mr. Shattuck testified in substance: The respondent was asked whether the misconduct mentioned in the foregoing letter to the secretary of the committee was of a kind which would be material in the divorce suit, and he said, after a pause, undoubtedly it was. He then was asked, "Did you tell this to the court or disclose it to the court?" and he said "No." He then was asked

why he didn't, and he said that he saw no reason for doing so, and he made further statements to the effect that he had never practised law with the idea that it was necessary to disclose in an uncontested suit such things, and had never understood from other lawyers that there was any such obligation. A little later he was asked this question: "Did you understand when the matter came before the court that Mrs. Brackett was or was not entitled to a divorce?" and he said, "I think I ought not to answer that question now, and perhaps never." It was stated to him by a member of the committee that, as his client had made a complaint against him, his privilege would be waived, and that the committee would hear what he had to say about it, and he said he would like to consult counsel. The committee said "Very well. Let us know if after consulting counsel you desire to make any further statement."

On December 21 the respondent wrote to the grievance committee a letter containing the following: "In explaining at the hearing December 17 what was characterized as my change of mind in refusing to make the statement of facts as to Mrs. Brackett as suggested in my letters to her and to your secretary, I said that the written complaint differed essentially from the complaint as I understood it from the oral statement of your secretary, that the time for such statement had not yet come, and that I should make it only as a last resort, because I did not wish to embarrass Mrs. Brackett and other parties, one of whom was a member of the bar and entirely innocent. I adhere to that determination. . . . If your committee has been told that I knew of facts which I was required to state to the court, I am entitled to know it before you proceed further. When such statement is made, I shall be ready to meet it, whatever it may be, and to make such further answer to your inquiries above referred to as may be necessary or proper."

The respondent, in his testimony with regard to his statements at the hearing before the grievance committee, agreed with Mr. Shattuck in every particular except that, when asked if he recalled being asked by the committee "Did you understand, when the matter came before the court, that she was or was not entitled to the divorce?" he replied, "I don't recall that; what is the answer?" He then being told that Mr. Shattuck had

stated that his answer was "I think I ought not to answer that question now, and perhaps never," said "I don't recall that question. I don't recall. I did not hear Mr. Shattuck's testimony about that. Really, I did not hear that this morning [at the trial] and I don't now. I really don't recall that question, and I don't recall that answer now. I am rather surprised at it. To the best of my recollection I did not testify that way before the committee. I think if I made such answer as that, I must have misunderstood the question." He then was asked "When this case came before the court, the divorce court, did you understand that Mrs. Brackett was or was not entitled to a divorce," and replied "I understood she was entitled to a divorce, and believe so now." "Then you did not understand that there was anything in her conduct of any kind which would disentitle her to a divorce?" "Certainly not." "And if you had understood that such was the case, you would have felt called upon to call it to the attention of the court?" "I would not. I would not act for the woman; I should refuse to make any statement to the court."

It was agreed that the respondent suffered from deafness at the time of the trial and also of the hearing before the grievance committee to such an extent as to make it difficult for him to hear the testimony of other witnesses and the questions of attorneys.

The testimony of Mrs. Brackett with regard to the extent of the services rendered her by the respondent and the amount to be paid him therefor was that, from October 20, 1904, until the following July, she probably saw the respondent at his office once a week on the average, and from the fall of 1905 until March 23, 1906, she saw him probably twice a week, that various detectives were employed to watch Brackett, who was hard to watch because, being an artist with no studio, he had no regular habits. After March 23, 1906, she saw the respondent every day until the settlement on April 13. When she first went to the respondent she had some talk with him about his charges, but there was no definite arrangement made. Subsequently, when the question of settlement came up, the respondent told her that if the case was settled on the basis of a settlement of $5,000, he should claim $1,000 of it and his expenses. She

then remarked that she thought that was quite exorbitant, and he said that it was usual when a case was taken in the way that was. Afterwards he said that he should claim just one half.

The testimony of the respondent with regard to the extent of his services and the amount to be paid him therefor was that Mrs. Brackett came to him in the middle of August, 1904, that he kept track of the amount of time he gave to her case; that he spent on it in all one hundred and fifty-four days of six hours each, that he had one hundred and twenty-five or one hundred and fifty interviews with her, most of them lengthy, and a still greater number with detectives and other persons who were working on the case, from whom he had between five hundred and six hundred pages of written reports; that the first time that he had any talk with Mrs. Brackett regarding his charge was on the day before the settlement was made, when he drew up a paper showing that his charge was to be $3,600, and handed it to her, stating: " I will take such portion of this $1,700 [which had just been paid him by Brackett's counsel] as you feel you care to let me have. I certainly must have my expenses and something over, and I will draw a note for the balance. I will draw an assignment of the bank account as collateral to the note," and that she said, " Very well." He further testified : " She said as to the amount of the charge, I understood (if I heard it correctly) that she only said it was rather large. She thought it was rather large. I do not recall that phrase. I do recall that she said this. She asked if I could not let her have $400 more, making an even $4,000 instead of $3,600 which she would get. I said to her, ' It seems to me I have made a reasonable charge here. I took all the responsibility. You have had an income of $250 a year out of your trust fund, and yet you have not turned any of it over to me. If I hadn't secured this result, I would have got no compensation that would have been at all adequate, and it seems to me that you ought not in fairness to ask me to take less than I think is fair and reasonable.' She said she was satisfied with that sum, and from that day to the present time has never made any complaint of any sort or kind to me."

It was undisputed that Mrs. Brackett paid nothing to the respondent on account of expenses or otherwise before April 13,

1906, but that she deposited with him as security on October 20, 1904, jewelry worth $250. The disbursements made by the respondent were more than $500.

Mrs. Brackett's testimony with regard to the interview with the respondent on April 13, when she signed the note for $3,100 and the assignment of the money in the bank to secure it, was that, after an interview of half an hour in the office of Brackett's counsel, when the settlement agreement was signed, the respondent asked her to step into his office, saying he had a little business to transact, that she objected, saying that she was very tired, and not able to transact any more business that night, that he said he would like to see her, and so she went into his office; that he presented the papers for her to sign. " I asked him to be excused from signing them that night, as I was very tired, and did not fully understand them; thought I would like to have an opportunity of examining them before I did sign. He replied that he would like me to sign those papers that night, as it was better business; more legal to have all papers of even date in the case. I exclaimed a little on the size of the fee, said I thought it was rather large. I don't remember that I said anything more. Mr. Hale claimed that it was a perfectly just charge on account of the difficulties of the case."

Besides his testimony hereinbefore stated as to his interview with Mrs. Brackett on April 12, the respondent testified that on April 13 she did not state to him that she was tired but appeared entirely calm and showed no excitement.

The respondent testified that the " misconduct " on the part of Mrs. Brackett that he referred to in his letters to her and to Mr. Shattuck were her habits of drinking intoxicating liquors and " frequenting or visiting questionable places," stating that she had mentioned Winter Place Hotel and Tomfohrde's restaurant, that he certainly never had seen her the " worse for liquor " but once, and he hardly could say she was intoxicated then; that the reason that he had asked Mr. Lane to deliver the message to Mrs. Brackett that he did, was because he did not want the names of other persons, among them Mrs. Lane, to be brought out at the hearing, as they would have to be in order for him fully to explain the reason why his charge for ser-

vices was so large as it was, namely, because the fact that he had to keep urging Mrs. Brackett not to drink and resort to questionable places, and to guard against her doing so, made his conduct of her case much more difficult.

Mrs. Brackett denied that she ever had told the respondent that she had been to the Winter Place Hotel or to Tomfohrde's restaurant with Mrs. Lane, and testified that she had no "special habits" with regard to the use of liquor, and never had been intoxicated.

At the close of the evidence, the respondent requested the presiding judge to rule as follows:

"1. Upon all the evidence in the case as a matter of law the petition cannot be maintained and should be dismissed.

"2. An attorney is not guilty of unprofessional conduct, who notifies his client, after disbarment proceedings instituted at her request, that if she does not retract her charges he will be compelled to make a statement of misconduct on her part which would be injurious to her and to other persons.

"3. There is no evidence in the case to warrant a finding that the respondent caused, or attempted to cause, Mrs. Gertrude S. Brackett to be notified that, if she proceeded with her complaint against him before the grievance committee, he would cause certain alleged misconduct on her part to be made public and would thereby injure her character and reputation in the opinion of persons known to her.

"4. There is no evidence in the case to warrant the finding that the respondent's charges for his services and disbursements were excessive or unreasonable.

"5. A libellant may be guilty of misconduct, which is not sufficient to be a cause for, or a bar to a divorce, but may be material on the issues of separate maintenance, alimony, or the custody of minor children, provided those issues are heard and tried by the court."

The presiding judge refused the rulings requested and made a finding of fact as follows:

"The court finds as to the charge set forth in paragraph four of the petition that the respondent did not know of the facts set forth in said paragraph and was guilty of no concealment and did not practise any fraud upon the court in the divorce proceedings.

" Upon the charge contained in paragraph five, the court finds that the respondent did not commit the acts therein stated, and did not act with the fraudulent intent therein set forth.

" As to the charge contained in paragraph six, the court finds that the sum which the respondent charged and retained from the amount received by him was excessive and unreasonable.

" As to the charge contained in paragraph seven, the court finds that, after Gertrude S. Brackett therein named had made her complaint to the secretary of the grievance committee of the petitioner, and after the respondent had had notice of such complaint, he, in order to prevent the said Gertrude from further proceedings against him before the grievance committee, caused her to be informed that, if she proceeded further with her complaint against him before the grievance committee, and unless she abandoned the same, he would cause certain misconduct of hers (meaning sexual immorality) to be made public, and would thereby injure her character and reputation in the opinion of persons known to her, and that he stated to the said grievance committee that he was in possession of evidence of misconduct on her part which was material to the divorce proceedings stated in the petition in this suit, intending to have the said committee understand that she had been guilty of sexual immoralities.

" In fact, he had no such evidence, and the court finds on the evidence before it that there was no such misconduct."

The presiding judge therefore ordered that the respondent be suspended from the office of attorney at law in the courts of this Commonwealth for the term of one year; and the respondent alleged exceptions.

Other facts are stated in the opinion.

*W. R. Bigelow,* ( *W. P. Hale* with him,) for the respondent.

*A. D. Hill,* for the petitioner.

SHELDON, J. At the hearing of this petition for the disbarment of the respondent, the judge found in his favor upon the charge contained in the fourth paragraph of the petition; and this part of the case is now settled in his favor.

The judge found that the respondent did not commit the acts stated in the fifth paragraph, and did not act with the fraudulent intent therein set forth, but that the sum which he charged and retained from the amount received by him as charged in the

sixth paragraph was excessive and unreasonable. The respondent now contends as to this that there was no evidence in the case to warrant the finding that his charges were excessive or unreasonable, and therefore that his fourth request for rulings should have been given. He also argues that it is now settled by the finding of the judge that the note which Mrs. Brackett gave to him was not obtained by fraud or with fraudulent intent to obtain money to which he was not entitled, and that the validity of that note is established by this finding. These claims may be considered separately.

On a careful review of the testimony, we cannot doubt that there was evidence to warrant the finding that the sum charged by the respondent was excessive and unreasonable. There was evidence that he was employed to obtain for Mrs. Brackett a divorce from her husband, and that he undertook to do so; that the chief difficulty in this lay in the lack of evidence to prove the adultery which it was suspected had been and was being committed; that to obtain this evidence the respondent employed detectives to watch the husband, and that they succeeded, after about a year and a half, in securing evidence of adultery; that he then, by claiming that the father of his client's husband was liable to her for procuring the alienation from her of her husband's affections, brought about a settlement with both her husband and his father, by which he secured for her the sum of $7,700 besides certain articles of household furniture and a provision for the support and education of her minor children. He also obtained the divorce which she desired. There was no doubt that her husband was a man of no property, and that she probably could not have collected alimony or expenses from him. It was agreed that the respondent's disbursements were properly reckoned at $500. For his services he charged the sum of $3,600, being one half part of the net amount of money received by him for her.

There was no doubt testimony on which it might have been found that this charge was not excessive or unreasonable. It was nearly two years from the time of the respondent's employment until the decree of divorce was obtained, and more than two years before that decree was made absolute and the final payment of $6,000 secured. According to the respond-

ent's testimony, much of his time, more than one hundred and fifty full days reckoned at six hours each, had been spent in working upon the matters involved and in interviews with his client and the detectives employed; many clues had been investigated and much labor performed which had not yielded the hoped for results. The prospect of obtaining a proper compensation for services and a reimbursement of money expended depended largely upon the result reached. And attorneys, properly qualified as experts, testified that under the circumstances claimed by the respondent his charges were reasonable, " viewed either from the standpoint of the results obtained or from the standpoint of *per diem* charges." If the respondent's testimony as to all these circumstances of the case were followed, a finding in his favor upon this point might well have been expected.

But right here is the infirmity of the respondent's position. The judge was not bound to accept his version of the circumstances. He might have found that, acting with due fidelity to his client's interests, the respondent was not justified in protracting his conferences with the client to such an extent as to consume the time to which he testified. The only litigation actually engaged in was the libel for divorce, and that was uncontested. The demand for alienation of affections never was actually put in suit. The judge well might find, as he did find, that the respondent's claim that peculiar difficulties in prosecuting the libel for divorce were caused to him by reason of misconduct on her part was wholly without foundation. His conduct before the committee of the Bar Association and what might have been found to be his efforts to stifle the inquiries which resulted in the bringing of this petition might be found to indicate that he wished to avoid investigation of the charge because he did not himself regard it as a fair and reasonable one. It is too plain for discussion that the judge might find a charge of $3,600 for procuring the discovery of evidence of adultery, bringing a libel and obtaining an uncontested decree of divorce, and settling an unlitigated claim for the alienation of the affections of a husband for what was obtained in this case, to be excessive and unreasonable, unless it was justified either by unusual ability and skill in the respondent or by the fact

that an unusual amount of labor and responsibility was called for and actually used. Upon these questions we cannot review the findings of the judge who tried the case.

But the respondent contends that the validity of the note which he took from his client has been established by the finding that it was not obtained by fraud or with any fraudulent intent on his part. He claims that he cannot be punished for unprofessional conduct on the ground that his charges were excessive and unreasonable when those charges have been found to be a matter of contract entered into without fraud. He cites the language used by this court in *Boston Bar Association* v. *Casey*, 196 Mass. 100 : " We do not mean to intimate by anything that we have said that Bruce could not legally have agreed with the respondent that he could have the $800 for such services as he might render, however much in excess that sum would be of a reasonable compensation for what was done." Undoubtedly an agreement fairly made between attorney and client, before that relation is entered into, as to the compensation to be received by the former for the services which it is expected that he will render, is *prima facie* valid and binds the parties to it. It was of such a supposititious agreement that the language above quoted from *Boston Bar Association* v. *Casey*, 196 Mass. 100, was used. But this agreement was made and the note and assignment were executed long after the confidential relation of attorney and client had been created between these parties, while it was still in full existence, before the decree for a divorce had been obtained, and before the absolute right to $6,000 of the money to be realized had accrued. It was one of those agreements between attorney and client which the law views with jealousy, and will enforce only to the extent of reasonable compensation for the services actually rendered. See the cases cited in 4 Cyc. 961 *et seq.*; 987 *et seq.* The respondent did not put himself at arm's length from his client before carrying out this transaction with her ; he did not see that she had independent advice, or secure her time to consider this important matter: on the contrary it might have been found that he hastened to complete the transaction against her objection when, by reason of fatigue and excitement, she did not fully comprehend the nature of the act. *Hill* v. *Hall*, 191 Mass. 253. Even though he acted

without any specific fraudulent intent, it cannot be said that this was so fair and free a bargain between parties who stood upon an equal footing that the court could not inquire and determine whether the amount charged was excessive and unreasonable.

Accordingly we are of opinion that this finding of the judge was warranted by the evidence, and that the respondent's fourth request was refused rightly.

The finding of the judge as to the matters charged in the seventh paragraph of the petition may be considered in connection with the respondent's second and third requests for instructions. Substantially this finding was that the respondent attempted to prevent Mrs. Brackett from proceeding against him by the threat that if she did so he would cause certain misconduct of hers to be made public and would thereby injure her character and reputation; and it was found by the judge that the respondent used the word "misconduct" in the sense of sexual immorality, and that in fact there had been no such misconduct on her part and he had no evidence of it, although he stated to the committee of the Bar Association that he was in possession of such evidence. The respondent contends that this finding was unwarranted by the evidence.

We have read over carefully the evidence upon this issue and are satisfied that it fully warranted the finding made. The judge was not bound to accept the explanation made by the respondent of his conduct in this matter. Without that explanation, there was abundant evidence that his object in what he did was to stifle the investigation of the charges against him by playing upon the natural fears of a woman against whom unfounded charges of sexual immorality were threatened. What he said to the witness Lane and what he said and wrote to Mr. Shattuck and to the committee of the Bar Association tend to support this view. And it was for the judge to determine the sense in which the respondent used the word "misconduct" and in which he intended it to be understood. The word was used with reference to divorce proceedings, and on some occasions in speaking to lawyers; and one of the definitions of this word given in the Oxford English Dictionary is "improper conduct; wrong behavior; now often in judicial spec. in the sense of adultery." And see 27 Cyc. 804. The real meaning intended

to be conveyed by ambiguous words is a question of fact in actions for libel. *Riddell* v. *Thayer,* 127 Mass. 487. *Twombley* v. *Monroe,* 136 Mass. 464. The circumstances and connection in which the word was used by the respondent tend strongly to indicate that he intended to be understood as threatening to make a charge of sexual immorality and to support it by evidence in his possession, which in fact he did not have. His refusal before the committee of the Bar Association to answer the question whether he understood, when the matter came before the court, that Mrs. Brackett was or was not entitled to a divorce, taken in connection with some of his testimony at the trial of this petition, points in the same direction; and it was for the judge at the trial to determine the effect of his explanation of this. We have examined the cases as to the meaning of this word referred to by the respondent, and find nothing in them inconsistent with what has been said. They illustrate the wide range of meaning which the word may have according to the different connections in which it is used. *Baldwin* v. *Foster,* 138 Mass. 449, 453. *Van Cleaf* v. *Burns,* 118 N. Y. 549. *English* v. *English,* 4 Stew. 543. *Rea* v. *Rea,* 63 Mich. 257.

We conclude, therefore, that this finding of the judge was warranted, and that the respondent's third request was rightly refused.

His fifth request was not material, upon the findings of fact made by the court, and need not be considered.

Upon these findings, the respondent's first request could not have been granted; and the order for his suspension was warranted. It needs no argument and no citation of authority to support this proposition.

*Exceptions overruled.*