O. W. LAWRENCE, appellee, v. ANTHONY TSCHIRGI, JR., et al.,
appellants.

No. 48189.

(Reported in 57 N.W.2d 46)

FEBRUARY 10, 1953.

Messer, Hamilton, Cahill & Bartley and George A. Williams, all of Iowa City, for appellants.

Wm. W. Crissman, of Cedar Rapids, for appellee.

GARFIELD, J.—This is a suit in equity by an attorney for declaratory judgment under rules 261, 262, Rules of Civil Procedure, that a written contract by which defendants agreed to pay plaintiff twenty-five per cent of what they realized from their father's estate is valid and to determine and recover the amount due thereunder. Following trial the court held the contract is valid and there is due plaintiff from each of the two defendants $17,999.72 plus $126.72 for expense incurred in addition to a total of $8468.74 previously collected by plaintiff from defend-

ants. Thus plaintiff's total fee amounts to $44,468.18 in addition to expense money. Defendants have appealed.

Plaintiff has practiced law in Cedar Rapids since 1930. Defendants, known as Tony and Ruth, are son and daughter by his second wife of Anthony A. Tschirgi who died testate March 28, 1948, leaving an estate valued by the state inheritance tax appraisers in excess of $435,000. In addition there were bonds, bank account and real estate valued at over $105,000 held in joint tenancy by testator and his surviving third wife.

The contract plaintiff seeks to enforce was prepared by him and signed by defendants August 15, 1946, after defendants' mother and defendants had consulted plaintiff about appointing a guardian for testator and conserving his property from alleged attempts of the third wife to obtain at least some of it. Defendants' mother had consulted plaintiff about these matters at times for nearly three years, Ruth for about a year, and Tony for nearly six months. For several years before his death testator and his third wife resided in St. Louis although Cedar Rapids was their home. For at least four years before his death testator was of unsound mind and was confined much of the time in hospitals or a sanitarium in St. Louis.

The defense to plaintiff's suit is that the attorney-fee contract was made while a confidential relation existed between plaintiff and defendants without a full and fair disclosure of the facts on which the contract was predicated, it exacts an unreasonable and exorbitant fee and is oppressive, plaintiff failed to perform the contract, there was no consideration for it or at least a failure of consideration. On the third day of the trial defendants amended their answer by alleging that because of plaintiff's negligence in failing to commence action to set aside the codicil to testator's will and plaintiff's misrepresentations to defendants to induce them not to contest the codicil defendants were damaged in the sum of $50,000 which should be set off against any amount due plaintiff.

I. The trial court found against defendants on all issues except he found the relation of attorney and client existed between plaintiff and defendants at the time the contract was made. Defendants are mistaken in asserting that because plaintiff did not appeal from this finding adverse to him it must now be taken

as a verity. We have frequently pointed out that a party who wins his case cannot appeal from a mere adverse finding. It is not prejudicial to him. See Creel v. Hammans, 232 Iowa 95, 5 N.W.2d 169, and citations; Shaw v. Addison, 236 Iowa 720, 733, 18 N.W.2d 796, 803, and citations; Roth v. Headlee, 238 Iowa 1340, 1348, 29 N.W.2d 923, 927; In re Estate of Tone, 240 Iowa 1315, 1320, 39 N.W.2d 401, 404, 405.

██ Plaintiff has argued, as he may without appealing, this adverse finding is erroneous and there was no relation of attorney and client between him and defendants when the attorney-fee contract was made. See Katz Investment Co. v. Lynch, 242 Iowa 640, 646, 47 N.W.2d 800, 804, and citations; In re Application of National Freight Lines, 241 Iowa 179, 184, 40 N.W.2d 612, 615, and citations; Iowa Elec. Co. v. Home Ins. Co., 235 Iowa 672, 676, 17 N.W.2d 414, 416, and citations.

II. It is important to determine at the outset whether the fee contract was made, as defendants contend and the trial court found, during the existence of an attorney-client relationship between plaintiff and defendants or, as plaintiff argues, at the inception thereof. It is more difficult for an attorney to enforce such a contract if made during the existence of the relationship rather than at its inception. See Edler v. Frazier, 174 Iowa 46, 52, 156 N.W. 182; 7 C. J. S., Attorney and Client, section 204a (2), page 1116; 5 Am. Jur., Attorneys at Law, sections 160, 189.

Some courts hold a contract for a percentage of the recovery made while such a relationship exists is void and no more than fair and reasonable compensation may be recovered no matter what sum is mentioned in the contract. Stern v. Hyman, 182 N. C. 422, 109 S.E. 79, 19 A. L. R. 844; 5 Am. Jur., Attorneys at Law, section 160. See also In re Howell, 215 N. Y. 466, 109 N.E. 572, 574, Ann. Cas. 1917A 527, 530.

██ Where such contracts made during the existence of the attorney-client relationship are not regarded as void they are viewed with suspicion and closely scrutinized by the courts, as are all dealings between trustee and cestui. There is a presumption of unfairness or invalidity attaching to a contract for compensation made after the relationship has been established and the burden is on the attorney to show it was fairly and openly made, that the client was fully informed concerning it and under-

stood its effect. Ridge v. Healy, 8 Cir., Mo., 164 C. C. A. 32, 38, 39, 251 F. 798, 804, 805; Lady v. Worthingham, 57 Cal. App.2d 557, 135 P.2d 205, 207; annotation 19 A. L. R. 847; 7 C. J. S., Attorney and Client, section 204a(2), page 1116; 5 Am. Jur., Attorneys at Law, section 189. See also Healy v. Gray, 184 Iowa 111, 118, 168 N.W. 222, and citations; Ryan Bros. v. Ashton, 42 Iowa 365; Robinson v. Sharp, 201 Ill. 86, 66 N.E. 299, 302; Bar Association of Boston v. Hale, 197 Mass. 423, 83 N.E. 885, 886; State v. MacIntyre, 238 Wis. 406, 298 N.W. 200, 205.

█ No formal contract is necessary to create the relation of attorney and client. Nor is payment of a fee necessary. The contract may be implied from conduct of the parties. Anderson v. Lundt, 200 Iowa 1265, 1269, 206 N.W. 657; Healy v. Gray, supra, 184 Iowa 111, 115, 168 N.W. 222; Brydonjack v. Rieck, 5 Cal. App.2d 219, 42 P.2d 336, 338; 7 C. J. S., Attorney and Client, section 65a and b; 5 Am. Jur., Attorneys at Law, section 31.

We have no doubt an attorney-client relation existed between plaintiff and defendants for at least several months before the fee contract was made.

█ Plaintiff's petition alleged he performed legal services for defendants to protect their interests in their father's property for about three years before the contract was signed. Plaintiff withdrew this allegation the day the trial commenced. Plaintiff's reply admitted an attorney-client relation existed before the contract was made. Plaintiff withdrew this admission just before he rested his case. Defendants offered the above allegation and admission in evidence and they are entitled to consideration as admissions. Beery v. Glynn, 214 Iowa 635, 643, 243 N.W. 365, and citations; Farmers Handy Wagon Co. v. Casualty Co., 184 Iowa 773, 779, 167 N.W. 204, 169 N.W. 178; Garrison Grain & Lumber Co. v. Farmers Merc. Co., 181 Iowa 568, 571, 164 N.W. 791; 31 C. J. S., Evidence, section 304; 20 Am. Jur., Evidence, section 631.

As a witness plaintiff says Mrs. Fisk, defendants' mother, first came to his office in the fall of 1943 regarding the dismissal of a guardianship against testator by another attorney, Mr. Dahms. A written stipulation provided the guardianship proceeding is dismissed with prejudice on condition that testator

should not change or revoke his will made August 26, 1941. The stipulation was signed by testator, his attorneys and by Ruth. It was not signed by Tony until after his father died. However, Mr. Dahms dismissed the guardianship with prejudice in the fall of 1943.

Plaintiff also testifies Mrs. Fisk came to see him four times in September 1943 in regard to defendants' interests and saw him several times during the next two years when the advisability of a guardian for testator was discussed. Ruth was away from Cedar Rapids during this two-year period and Tony was in the Army until February 1946. When Ruth returned to Cedar Rapids in August 1945, a year before the fee contract was made, her mother took her to plaintiff's office and she consulted him several times. When Tony was discharged from the Army Ruth and he went to plaintiff's office and several consultations were held with one or both defendants before August 15, 1946.

It is quite apparent defendants' mother was acting in their interests in consulting plaintiff during the two years before Ruth's return to Cedar Rapids and plaintiff so understood. See Anderson v. Lundt, supra, 200 Iowa 1265, 1269, 206 N.W. 657. The mother had long been divorced from testator and was not a beneficiary under his will. She had no prospective interest in his estate. Plaintiff admits he told Tony a few days before this suit was started he had been representing him since 1943.

On her first trips to plaintiff's office Mrs. Fisk not only consulted him about the dismissal of the guardianship proceeding by Mr. Dahms but also told him one Monroe informed her a large sum had been withdrawn from testator's bank account and deposited in the name of his third wife who had tried to purchase stock in Russell's Railway Guide, an extremely lucrative corporation of which testator owned controlling interest and Monroe had been manager. Mrs. Fisk also told plaintiff the Mayo Clinic had written that testator was incapable of signing legal papers and she gave plaintiff names of those she said knew testator's mental condition. On one occasion Mrs. Fisk told plaintiff she had been informed by a bank employee testator had purchased $129,000 in war bonds.

A copy of testator's will made August 26, 1941, was left with plaintiff, probably as early as the fall of 1943, and before the fee

contract was made he had the stipulation in the guardianship brought by Mr. Dahms. Plaintiff had also obtained from the courthouse the files in the guardianship proceeding. Mrs. Fisk testifies in substance that when she first consulted plaintiff he said "he knew all about it" from talking with Mr. Monroe. Plaintiff says Monroe had already given him much of the information Mrs. Fisk did.

We need not refer to other testimony which clearly shows plaintiff had long acted as defendants' attorney when the fee contract was made.

III. We set out now the contract on which this suit is based:

"AGREEMENT FOR CONTINGENT FEE

"WHEREAS, the undersigned are heirs at law of Anthony A. Tschirgi; and

"WHEREAS, Anthony A. Tschirgi is now in such physical and mental condition that he does not now take care of his business; and

"WHEREAS, Anthony A. Tschirgi is living in a hospital in St. Louis, Missouri; and

"WHEREAS, these undersigned desire to employ O. W. Lawrence of Cedar Rapids, Iowa, as their attorney to represent them in looking after their interests in what they might have coming from Anthony A. Tschirgi now and at the time of his death, and in conserving the assets that belong to him at the present time.

"Now THEREFORE, it is agreed that said O. W. Lawrence will act as attorney for the undersigned in all matters arising out of anything in connection with having an administrator appointed, in helping to conserve the assets of Anthony A. Tschirgi, or in matters arising out of a will or the probating of his estate, in whatever court or courts the same may be brought, and shall receive as his compensation the amount of 25% of the property or money realized by the undersigned, either out of the estate or if a settlement is effected prior to the time of Anthony A. Tschirgi's death.

"It is also understood that the attorney is to be reimbursed for any expense in any litigation that might follow, and the court costs are to be advanced and furnished by the undersigned.

"It is also understood that said attorney is not to compromise any suit or make any settlement without the consent of the undersigned.

"Dated this 15th day of August, 1946.

/s/ ANTHONY TSCHIRGI JR.
/s/ RUTH TSCHIRGI BERRY."

Under the authorities above-cited it is our duty to view this contract with suspicion and scrutinize it closely. It is presumed to be unfair. The burden is on plaintiff to show it was fairly made, that defendants were fully informed concerning it and understood its effect. We think plaintiff has failed to discharge this burden.

It is noticeable plaintiff did not sign the contract. His acceptance of it obligated him only to act as attorney for defendants in the matters specified. Plaintiff did not agree to commence action to have a guardian appointed for testator, to set aside his will or codicil, to recover money or property transferred to the third wife, or any other purpose. For acting as attorney in the matters specified plaintiff was to receive twenty-five per cent of what defendants realized from their father's estate regardless of whether there was litigation or plaintiff benefited them in any way. Under this contract defendants could retain only three fourths of what they might have received from their father's estate if plaintiff had not acted as their attorney. It seems to us the contract is one-sided.

Nor is it shown satisfactorily that defendants were fully informed concerning the contract and understood its effect. When the contract was signed Tony was twenty-six, Ruth twenty-eight. Tony had completed the ninth grade in school and attended a military academy four years. He then worked in a wholesale warehouse and a factory until he enlisted in the Army in October 1942. Ruth had graduated from high school, attended the state university two and one-half years and taken shorthand, typing and bookkeeping in a business college. She then was employed as stenographer in Mr. Dahms's law office "off and on" about two years. Aside from this employment of Ruth neither defendant had business experience.

Defendants received no independent advice before signing

the fee contract. Plaintiff did not give his clients such advice regarding it as a disinterested attorney could be expected to give them or such advice as plaintiff should have given them if the proposed contract were between them and a strange attorney. See in this connection Ridge v. Healy, supra, 8 Cir., Mo., 164 C. C. A. 32, 40, 251 F. 798, 806; Robinson v. Sharp, supra, 201 Ill. 86, 66 N.E. 299, 302; French v. Cunningham, 149 Ind. 632, 49 N.E. 797, 799; Bar Association of Boston v. Hale, supra, 197 Mass. 423, 83 N.E. 885, 886; 7 C. J. S., Attorney and Client, section 204a(2), page 1116.

It appears defendants and their mother acting in their interests had gone to plaintiff because they had been reliably informed testator, then in failing physical and mental condition, was transferring money or property to his third wife. It later developed that a short time before Mrs. Fisk first consulted plaintiff over $100,000 deposited in testator's name was changed to an account payable jointly to testator and his third wife.

As defendants and their mother knew when plaintiff was first consulted, testator's will, dated August 26, 1941, after leaving personal belongings and half the net estate to the third wife (Grace) and legacies totaling $19,000 to testator's sisters, brothers, and a son by a prior marriage (Paul), left the rest of the estate in trust until Tony reached age thirty. Then $10,000 of the trust fund was payable each to Tony and Ruth, one sixth of the remainder to Paul, the rest equally to Tony and Ruth. Thus under this will Tony and Ruth would receive five sixths of half the net estate if the personal belongings and legacies totaling $19,000 are disregarded.

Soon after Mrs. Fisk first went to plaintiff in September 1943 he knew the terms of this will. He knew also that testator and his attorneys had agreed in writing, in the stipulation of settlement of the guardianship proceeding commenced by Mr. Dahms, that testator would not change or revoke his will.

Under these circumstances what defendants and their mother consulted plaintiff about is the steps that could be taken to prevent testator from transferring other money or property to his third wife and to recover what had been transferred. Before the fee contract was made plaintiff urged the early appointment of a guardian and action by him to recover what had been transferred

to the third wife. In fact plaintiff urged this upon Mrs. Fisk before either defendant consulted him.

There was little ·if any talk during this period about plaintiff's representing defendants after testator's death in the probating of his estate. Defendants thought they were employing plaintiff to commence a guardianship proceeding against testator and plaintiff led them to believe he would do so. No such action (nor any other action) was ever commenced although plaintiff was repeatedly urged to do so, especially by Tony, until shortly before testator died.

Plaintiff's principal excuse for not commencing action for appointment of a guardian is that he concluded service of notice thereof upon testator in this state was necessary, under Raher v. Raher, 150 Iowa 511, 129 N.W. 494, 35 L. R. A., N. S., 292, Ann. Cas. 1912D 680, and testator was in St. Louis, although most of his property and money were in Cedar Rapids where he was still domiciled. Raher v. Raher, supra, was overruled November 11, 1947, by Edwards v. Smith, 238 Iowa 1080, 29 N.W.2d 404, 175 A. L. R. 1318. Although this was more than four and one-half months before testator died plaintiff testifies Tony did not then want a guardianship proceeding commenced because he did not think his father would last very long.

Plaintiff says that long before the fee contract was made he looked ·up the law, and talked many times to an older attorney associated with him, regarding the appointment of a guardian for testator. He had long known testator was in St. Louis. We think it was plaintiff's duty to tell defendants before the fee contract was signed that in his opinion a guardian could not be appointed for testator unless he could be served with notice in Iowa. It is not shown he divulged this information to defendants until some time after the contract was made.

On the evening before the contract was signed defendants talked to plaintiff regarding the appointment of a guardian for their father, the terms of his will, reports the third wife had gotten some of his money, and perhaps other matters. The matter of plaintiff's fees arose and a so-called contingent fee was agreed upon. Plaintiff testifies on direct examination the fee was to be twenty-five per cent. He does not say on what this percentage

was to be computed—"There was no discussion about that except they said it was all right. I told them I would draw up the papers and they could come back tomorrow and sign them. I drew up the papers and they came in the next day and signed them."

On cross-examination plaintiff testifies, "There was no explanation in regard to the fee whatever. They asked me how much and I told them twenty-five per cent, they said that was fine and I drew up the papers. * * * I did not explain to defendants that under that agreement it could be possible they might have to pay me more than I could save them in the estate." Except in rebuttal plaintiff does not say he told defendants the fee would be twenty-five per cent of what they received from their father's estate.

Ruth and Tony testify that when the contract was handed them to be signed they objected to the size of the percentage. They say they had understood the fee was to be fifteen per cent. Mrs. Fisk testifies plaintiff "said he would take it under fifteen per cent of all he could save for them." Plaintiff admits he had talked with Mrs. Fisk about fifteen per cent. Ruth says that when the contract was signed plaintiff explained the fee would be twenty-five per cent of what he saved for them and she understood if nothing was recovered there would be no fee.

Although defendants agreed to a fee of twenty-five per cent it is by no means clear plaintiff told them or they understood it was to be twenty-five per cent of what they received from their father's estate regardless of whether plaintiff's services benefited them. Defendants insist they did not understand this. The usual contingent fee arrangement calls for payment of part of what is recovered for the client, not for a percentage of what the client would receive in any event irrespective of the attorney's services. We think it was plaintiff's duty, in the exercise of the utmost good faith required of him toward his clients, to explain to them that the fee was to be computed upon all they received from the estate, not merely upon what he was able to recover for them.

Except for some testimony of plaintiff in rebuttal it clearly appears, even from plaintiff's own evidence, there was no such explanation. On rebuttal plaintiff says nothing was said on August 14 and 15, 1946, about twenty-five per cent of what he would save for defendants and, largely as a conclusion, that they

understood it was to be twenty-five per cent of what they received. Even in rebuttal, however, plaintiff testifies, "It was discussed on those days that there might not be any property in the estate and I was to get twenty-five per cent of whatever *I* would get out of this estate."

In any event the talk between plaintiff and defendants before the contract was signed was very indefinite as to what if anything plaintiff was to do for defendants other than to start action for the appointment of a guardian for testator in the hope of recovering money or property transferred to the third wife. And if there was any talk that the percentage fee was to be computed upon the amount defendants received from the estate it was also indefinite and it has not been shown this was made clear to defendants or that they so understood.

There is much testimony that before the fee contract was signed plaintiff informed defendants it would be a lot of work to get a guardian appointed for testator, although plaintiff admits in effect he was then satisfied testator was incompetent. He also told defendants it would be necessary for him to go to St. Louis and that twenty-five per cent was the usual fee. We think plaintiff, unwittingly perhaps, exaggerated the amount of work it would be necessary for him to perform.

Plaintiff made no trip to St. Louis until after objections were filed on August 28, 1950, to the executors' final report. This was more than two years after the will and codicil were filed for probate and admitted and was too late to commence action to set aside such probate. (Section 614.1, subsection 3, Code, 1950.) It was also difficult after such a delay to obtain evidence in St. Louis as to testator's mental condition. We believe it is unusual for an attorney to exact from clients who are prospective beneficiaries of an estate an agreement to pay him, for merely acting as their attorney, twenty-five per cent of what they receive from the estate.

We have not overlooked testimony for plaintiff of three Cedar Rapids attorneys, in answer to a hypothetical question, that such a contract as this is reasonable. Two of the attorneys admitted on cross-examination they had never known of a lawyer's obtaining a contract to give him twenty-five per cent of anything a client would inherit from an estate regardless of

whether there was litigation. The opinions of these attorneys bear only upon the reasonableness of the contract itself, not as to whether it was entered into fairly, with full knowledge and understanding. Their testimony seems to assume defendants were fully informed concerning the contract and understood it. We are not called upon to hold the contract could not be enforced if it were shown it was fairly entered into, after defendants were fully informed regarding it and understood it.

In Edler v. Frazier, supra, 174 Iowa 46, 156 N.W. 182, on which plaintiff strongly relies, and in other Iowa decisions he cites, the contract for fees was made at the inception of the attorney-client relation when the attorney was free to deal at arm's length. As we have indicated and as Edler v. Frazier recognizes (at page 52 of 174 Iowa) a different rule applies where, as here, the contract is made after such a relation has been in existence. The authorities cited in Division II hereof make this clear.

Plagmann v. Bray, 193 Iowa 917, 188 N.W. 150, and Gipp v. Lynch, 226 Iowa 1020, 285 N.W. 659, cited by plaintiff, are even more clearly not in point. Each was a law action to recover, because of claimed fraudulent representations, money paid defendant-attorney for services later performed. Recovery was denied because there was no evidence plaintiff suffered any loss or damage from the alleged fraud. These decisions furnish no support for plaintiff's contention the burden rested on defendants here to prove the reasonable value of plaintiff's services and that the fees claimed under the contract exceed such value. Plaintiff says unless this is done defendants have not been prejudiced by any conduct of his which might be constructively fraudulent.

Plaintiff's contention is without merit. He is seeking the aid of a court of equity to enforce this contract and the burden is on him to establish its fairness and that it was fairly entered into. If, as we hold, plaintiff has not met this burden he is not entitled to recover on the contract. Defendants were under no burden to prove the reasonable value of plaintiff's services. Ridge v. Healy, supra, 8 Cir., Mo., 164 C. C. A. 32, 48, 251 F. 798, 814.

Defendants argue, contrary to plaintiff's contention, he may not recover on the contract more than the reasonable value of his services, the burden rested upon him to prove such value and since there is no such proof he is not entitled to prevail. Respectable authority appears to support defendants' argument. These decisions seem to hold that the attorney's burden to show the fairness of the contract requires a showing that the contract fee does not exceed the fair value of the services performed.

Equally respectable precedents hold in effect that if it appears the contract was fairly entered into, with full knowledge and understanding, the attorney's recovery is not restricted to the reasonable value of the services rendered. This question appears not to have been decided by us in any case where the contract was made during the existence of the attorney-client relation. Since we hold plaintiff has not met the burden of showing the contract was entered into with full knowledge and understanding and therefore plaintiff is not entitled to recover the contract fee we need not determine this question.

Upon like reasoning we feel it is also unnecessary to decide the issue raised by defendants' second amendment to answer which claims a setoff against any amount due plaintiff on the fee contract because of alleged negligence of plaintiff in failing to commence action to set aside the codicil to testator's will and claimed misrepresentations to induce defendants not to contest the codicil. (Under the codicil, executed October 16, 1945, admitted to probate with the will, defendants received approximately $40,000 less than they would have received under the will.) Further, if plaintiff should elect to litigate the reasonable value of his services defendants should not be precluded from interposing this issue by way of setoff to such a claim. We express no opinion on the merits of this pleaded setoff.

IV. Many precedents which refuse to enforce a contract for attorney fees point out that the decision does not deny the right to recover the reasonable value of the services rendered if the attorney seeks to avail himself of that right. There is no evidence before us from which we could determine the reasonable value of plaintiff's services nor has plaintiff asserted a claim

therefor. Our decision is without prejudice to any right plaintiff may have to recover the reasonable value of his services.

For decree dismissing plaintiff's petition in harmony with this opinion the cause is—Reversed and remanded.

All JUSTICES concur except THOMPSON, J., who takes no part, and LARSON, J., not sitting.