F. H. EDLER, et al., Appellees, v. MATILDA FRAZIER et al., Appellees; CRAIL & CRAIL, Interveners, Appellants.

**ATTORNEY AND CLIENT:** Contract for Compensation—Reason-
1 ableness—Evidence. Evidence reviewed, and *held* to show that
a contract was neither unreasonable nor oppressive under which
attorneys were to receive 20 per cent of the value of certain lands
for services in protecting the interests of certain children in their

possible interest in their mother's estate, the compensation being payable after the death of the mother, which occurred 7 years later.

**ATTORNEY AND CLIENT:** Contract for Compensation—Reasonableness—Burden of Proof. The rule "that contracts entered into between attorney and client subsequent to the employment are *presumptively fraudulent* and that an attorney who seeks to recover on such a contract has the burden of proof to show that the contract, as made, was fair and equitable, and was entered into by the client after being fully informed of his rights", *has no application to the contract by which the relation of attorney and client is established,* such contract not bearing on its face evidence of undue advantage.

**ATTORNEY AND CLIENT:** Contract for Compensation—Fraud and Undue Advantage—Evidence. Evidence reviewed, under a charge that a contract between attorney and client was procured by fraud and undue advantage on the part of the attorney, and *held* that the client upon whom rested the burden of proof had not established such charge.

**CONTRACTS:** Requisites and Validity—Possible or Expectant Interest in Property—Contract for Lien—Assignment. A contract on adequate consideration, concerning one's merely *possible* or *expectant* interest in an estate, is enforceable. So *held* where one contracted to give an attorney a lien on his *expected* interest in an estate in consideration of services in protecting such *expected* interest.

**ATTORNEY AND CLIENT:** Contract for Compensation—"Catching Bargains"—"Unconscionable Agreements". A "catching bargain" is a bargain for a loan or payment of money on oppressive or extortionate or unconscionable terms to an impecunious person having property in reversion or expectancy. Contract between an attorney and client reviewed, and *held* not to be such.

**CONTRACTS:** Requisites and Validity—Public Policy—Assignment of an "Expectancy". An assignment on adequate consideration of a portion of one's merely possible or expectant interest in an estate is not against "public policy".

*Appeal from Jefferson District Court.*—SENECA CORNELL, Judge.

THURSDAY, FEBRUARY 10, 1916.

SUIT in equity for partition in which Crail & Crail intervened, setting up a claim or lien upon the property sought to

be partitioned. There was a decree below ordering the partition as prayed, and dismissing the petition of the interveners, who prosecute this appeal. The material facts are stated in the opinion.—*Reversed* and *Remanded.*

*John F. Ready* and *Crail & Crail,* for appellants.

*E. F. Simmons,* for appellees.

WEAVER, J.—F. C. Edler, a resident of Jefferson County, died February 24, 1906, leaving a will by which he sought to dispose of his estate, the principal item of which was 310 acres of land. He left surviving him his wife and seven children: F. H. (or Henry) Edler, Matilda Frazier, John L. Edler, L. G. (or Lew) Edler, William P. (or Peter) Edler, David Edler and Frank H. Edler, all of them being of adult age. The will was filed for probate but, its terms not being satisfactory to at least some of the family, a contest was contemplated; later, the will was withdrawn and the estate settled by agreement. About the same time, the children, or some of them, were considering also the matter of applying to the court for the appointment of a guardian to take charge of the property of their mother. One of the heirs, Henry Edler, applied to the interveners, Crail & Crail, then engaged in the practice of law at Fairfield, for advice, and proposed to employ them on behalf of the heirs on the basis of a contingent fee. After some talk, the parties separated, with the understanding that Henry would get the other heirs to come with him to the office of the Crails for further consideration of the subject of employment. Later, a written agreement was drawn, by which it was stipulated that the heirs employ Crail & Crail to look after and protect their interests as prospective heirs of the estate of their mother and procure for them their respective shares therein after their mother's death, and especially their shares in a certain described tract of land, and that, as compensation for such services, Crail & Crail were to receive a sum equal to 20 per cent of the value

of the property so to be received by the heirs through their mother at her death, and that such claim for compensation should be a lien upon their respective interests in said land. This agreement was signed by all the heirs except John Edler. Though not expressed in the writing, Crail & Crail admit that, as a part of the consideration therefor, they were to appear for and protect the interests of the heirs in the matter of the contest of their father's will then contemplated, and to secure a satisfactory settlement and division of his estate. It is the theory of Crail & Crail that, under the terms of the will of F. C. Edler, the wife would have been left practically nothing and that some of the children were devised less and others more than their fair share in the estate, and that, through their services as attorneys under said agreement, they secured and had set apart to the widow as dower 110 acres of the land, and that, by bringing about a compromise and settlement effected by proper conveyances between the heirs, they secured also a satisfactory settlement and division of all the rest of said estate. It is also their further claim that, the mother being of advanced age and showing a tendency to squander her property, the heirs were apprehensive that she might waste it or might be influenced to make an unwise or unfair disposition thereof by deed or will, and they desired to have a guardian appointed to protect her and her prospective heirs against such contingency, and that, proceeding under the contract in question, said attorneys did bring the necessary action and obtained the appointment of a guardian, who continued to serve as such until the death of his ward in the year 1914, with the result that, through inheritance from her, said tract of 110 acres of land descended in equal shares to her seven children. After the mother's death and, as it is claimed, upon agreement with at least part of the heirs, Crail & Crail, now residents of California, with their local counsel, J. F. Ready, began an action for the partition of said land, and in the petition therefor, the lien of Crail & Crail,

pursuant to said contract, was recognized. Later, the heirs appear to have resorted to other counsel, under whose advice they filed a dismissal of said action and brought another, the one now before us, for the same relief, except that they therein ignored the claim of Crail & Crail until the latter came into the case by intervention.

In answer to the petition of intervention, the heirs, except John and Frank, united in an answer denying the claim of Crail & Crail and their right to any lien upon the proceeds of the partition sale. Further answering, they say that if they signed the alleged contract they "were not fully advised of its meaning and purport and did not understand or know what they were signing", and deny that they are bound thereby. They further say that they have little or no education and "some of them" cannot read or write the English language, and those who can read or write do so with difficulty, and "some of them" cannot write their own names. They further say that they were solicited by Crail & Crail and were persuaded by them that it was necessary that they have legal counsel to protect their interests and that such attorneys would attend to such duties and that their fee would be light and would come out of the property after the death of their mother, but they neglected and failed to explain to defendants the meaning of "twenty per centum" and intentionally withheld such explanation, whereby they deceived and misled defendants into signing such contract. They further allege that the action in partition has proceeded to such stage that the land has been sold for about $9,000. It is otherwise made to appear that a portion of the selling price has, by order of said court, been withheld from distribution to await final adjudication of the claim of the interveners.

Upon hearing the evidence, the trial court dismissed the petition of the interveners, suggesting in a written opinion that the decision was based upon the theory that the contract between the interveners and the Edler heirs was made between counsel and client, and that the burden was therefore upon the former to show that the agreement was fair in its terms,

was influenced by no misrepresentations, and fully explained
to the clients, and that this burden had not been fully met
by the interveners.   The court further suggested that it
seemed apparent that the compensation agreed upon was
exorbitant.

    I.   The somewhat unusual character of this case has led
us to examine the evidence as to this contract and the cir-
cumstances of its making with considerable care, and we are
strongly impressed with the view that the conclusion reached
by the trial court cannot be sustained.

    If it were clear that the compensation provided for in
the contract was so unreasonable or extravagant as to suggest
the thought of fraud in its procurement, the court would be
justified in viewing the entire deal with sus-
picion; but in our judgment, such is not the
case.   In the first place, no practicing lawyer
has undertaken to testify that the compensa-
tion contracted for was unreasonable or
unusual.   The question is, moreover, to be viewed from the
standpoint of the facts as they then existed.   It is shown in
evidence, without dispute, that the value of this tract of land
at the date of this contract was not to exceed about $4,000.
Under the contract, if the contingent fee had then been
presently payable, it would have been one fifth of six
sevenths of $4,000, or about $685.   But it was not presently
payable.   The widow continued to live seven years or more
after the service was performed and, had her lease of life
then been known and interveners had desired to discount
their claim at 6 per cent, they would have realized therefrom
about $480—certainly not a very extravagant fee.   The fact
that increase in the value of the land has operated to sub-
stantially increase such compensation ought not to cast any
taint of suspicion upon the good faith of the interveners.
Had the market value of the property decreased, they would
have been compelled to accept a proportionally decreased
figure.

1. Attorney and
Client: con-
tract for com-
pensation;
reasonableness:
evidence.

Assuming, as we think we must, that there is nothing upon the face of the contract to stamp it as unreasonable or oppressive, we have next to consider whether the relation between the parties at the date of the contract was such as to cast upon interveners the burden of negativing a presumption of fraud or undue advantage in obtaining it. If the relation of attorney and client had been established before this agreement was entered into, it may be admitted that interveners would be required to make clear showing of their good faith in the transaction; but, generally speaking, this rule does not apply with the same stringency to contracts by which that relation is inaugurated. Mr. Page, in his work on Contracts, after stating the general rule on which appellees here rely, says, "Its proper application is to contracts between attorney and client after they have entered upon their confidential relations". Or, as stated by the Illinois court, "Before the attorney undertakes the business of his client, he may contract with reference to his services because no confidential relation then exists and the parties deal with each other at arm's length". *Elmore v. Johnson,* 143 Ill. 513, (21 L. R. A. 366, 370). It has often been held that a promissory note given to an attorney in advance of or at the time of his employment is not presumptively fraudulent, and, if the services be performed by the attorney, the client cannot defend against the note on the ground that they were not worth the amount agreed upon. *Schaffner v. Kober,* (Ind.) 28 N. E. 871; *Pennington v. Nave,* 15 Ind. 323; *Bright & Arledge v. Taylor,* 4 Sneed (Tenn.) 159; *Mitcherson v. Dozier,* 7 J. J. Marsh (Ky.) 54. In a Wisconsin case, *Dockery v. McLellan,* 67 N. W. 733, the plaintiff, an attorney at law, took a contract by which, in consideration of services to be rendered, he was to receive one third of the profits to be earned under certain paving contracts. Upon suit's being brought to enforce the contract, it was pleaded that the services were rendered by plaintiff as an attorney at law;

2. ATTORNEY AND CLIENT: contract for compensation: reasonableness: burden of proof.

that they were worth not to exceed $100, while, under the terms of the contract, he would recover about $4,000. In sustaining the contract, the court says:

"There was no confidential relation existing between the parties at the time, and the technical relation of attorney and client did not then exist; and the circumstance that litigation might ensue, in order to protect the interests of McLellan in the partnership or paving contracts, will not materially alter the rights of the parties. Before an attorney undertakes the business of his client, he may contract with reference to his services and the amount of his compensation, and even, as the cases cited show, for a contingent fee or reward because no confidential relation then exists, and the parties deal with each other at arm's length."

The court then further says, and we think it appropriate here:

"Evidently, when the parties are standing upon an equal footing, they have a right to determine, each for himself, upon what terms the relation shall be formed, and such we understand to be the transaction in the present case; and, as no confidence can be said to have been first extended, it is difficult to say upon what ground the plaintiff is under the necessity of vindicating the fairness and reasonableness of the contract, as a condition of enforcing it."

This rule is restated in 2 Ruling Case Law, p. 1036, 1037, in substantially the same terms:

"Before an attorney undertakes the business of a client he may contract with reference to compensation for his services,.as no confidential relation then exists and the parties deal with each other at arm's length". After a very copious reference to the authorities the editor of that work lays down the rule that "a contract made under such circumstances is as valid and unobjectionable as if made between other persons not occupying fiduciary relations, and who are, in all respects, competent to contract with each other . . . and the attorney, as a condition of enforcing it, is not bound

to show that it was just, fair, and reasonable as is often held to be his duty in case of contracts made after the inception of the relation of attorney and client''.

Many other authorities could be cited to the same effect, but we have mentioned enough to indicate the recognized rule. Indeed, any other rule would be most unreasonable. The lawyer has the same right as any other man to prescribe the conditions on which he will undertake to perform any given service. If the client thinks the terms unreasonable or oppressive, he is under no compulsion to employ him. The country is full of lawyers, and among them he doubtless can find those who may be retained on terms satisfactory to him. If, however, he accepts the terms and agrees to pay, then, under all ordinary conditions, he is bound by every principle of law and good morals to make payment accordingly, and it would be an unjust reflection upon the profession to lay down the rule that such an agreement comes into court bearing the brand of presumptive fraud, and that before it can be enforced, the plaintiff must put it through a process of legal fumigation by showing affirmatively that it was entered into without deceit or undue advantage. This is not to say that a contract which bears upon its face the evidence of undue advantage over the client will be held any more sacred in the hands of a lawyer than when sought to be enforced by any other person, and, when it clearly appears that the contract is unconscionable or manifestly oppressive or that an agreement for extraordinary compensation has been obtained by the solicitations of an ''ambulance chaser'' or the use of other unprofessional arts to entrap the ignorant or unwary, no court will hesitate to protect both the honest client and the reputable lawyer by compelling him who asks the benefit of such agreement to purge it of its apparent inequity. *Ryan Bros. v. Ashton*, 42 Iowa 365. In our judgment, the contract between the interveners and the Edler heirs was an agreement preliminary to their service, fixing the agreed compensation for their professional services to be rendered, and

that interveners are not required to assume the burden of showing its reasonableness or fairness. The evidence fairly shows that, from the very outset of the negotiation, the parties contemplated that the service, if performed, was to be upon the basis of a contingent fee, and, while the signatures of the heirs were not all obtained before any service was performed, the terms were agreed upon at the outset, and the procurement of the signatures of those who were not present at the first interview was merely the carrying out of such verbal understanding. More or less directly in point with our holding upon this branch of the case are *Shirk v. Neible,* 156 Ind. 66; *Clifford v. Braun,* 75 N. Y. Sup. 856; *Title Guarantee & Trust Co. v. Stemberg,* 103 N. Y. Sup. 857; *Cooley v. Miller & Lux,* 156 Cal. 510, 524; *Rust v. Larue,* 4 Litt. (Ky.) 412. And quite in point is *Ringen v. Ranes,* 263 Ill. 11.

II.   The execution of the written contract being admitted or proved, we have next to consider whether the appellees have shown actual fraud or undue advantage in its procurement; for in this respect the burden is upon

3. ATTORNEY AND CLIENT: contract for compensation: fraud and undue advantage: evidence.

them. In this we have to say that there was a distinct failure. Not one of the six heirs whose name is attached to the paper denies his signature thereto. Indeed, the answer does not put in issue the fact that they did sign it. Some of them say that they do not remember signing it, yet each in turn in some part of his testimony clearly reveals his knowledge and recollection that he did sign it; but practically all unite in saying that they had no comprehension of what was meant by 20 per cent. In final analysis, the defense made against this contract is that all these heirs were so grossly ignorant and incompetent that they had no fair comprehension of the meaning of the words "twenty per cent", and were entrapped into signing a paper of the effect of which they had no intelligent conception. It is hard to resist a conclusion, upon a reading of the record, that this defense was somewhat overdone, and that it defeats itself by its very

,extravagance. It may be true that these people, or most of them, would not have been capable of making an arithmetical computation of interest or percentage, but that they did not know the essential meaning of "per cent" or "twenty per cent", we cannot believe. They were all people of at least middle age. They had been transacting business (in a small way, perhaps) for years. They had borrowed money, contracted debts, given and paid notes and mortgages. One of them, at least, had made a note and mortgage to counsel representing them in this case. Mere lack of education, though it go to the extent of inability to read or write, does not disqualify a person to do business or relieve him from legal liability upon his contracts. There are many persons who manage to live, do business and achieve some measure of success even under such handicaps. It fairly appears that, before having any consultation with Crail & Crail, these heirs, or most of them, had considered among themselves the matter of settling the father's estate and the advisability of having their mother placed under guardianship, and of their own motion sought to employ the services of interveners. It is equally clear that from the outset it was understood that their employment was to be upon a contingent fee, and the per cent or share which counsel were to receive was a subject of negotiation between them. F. H. Edler admits as much, and says that, when he signed the papers, interveners told him that it was a little per cent they would handle it for. He says they read it over to him, but he didn't understand it, and they didn't tell him in dollars what 20 per cent amounted to, and he would not have signed it had he known how much it would amount to. It further appears that he had a copy of the contract from the time it was made, and he says that he "didn't think the contract was fair from the first". The witness further says that he has borrowed money, given notes, and has usually paid 5 or 6 per cent, and knows what that means, and now knows that "twenty per cent is pretty

big''. Lew Edler says, in substance, that he knew that there
was a contract, but didn't know how much it was. Again he
says, ''I knew it was for twenty per cent'', but didn't know
how much it was. W. P. Edler at first fails to remember
where he signed the contract and does not remember whether
it was read over to him. He knows what 6 per cent interest
is, but doesn't know what is meant by per cent. He finally
remembers that he can't write his own name and that his wife
or someone else signs it for him. Doesn't remember who
signed his name to this paper. David Edler testifies that he
doesn't remember signing the paper, yet later says, on cross-
examination:

''I made my mark. I remember you (Mr. Crail) reading
the paper over to me. I remember that you explained that
all my brothers and sisters had signed it or one just like it.
I said at the time if they signed it, it suited me all right. I
don't remember whether Henry agreed to it or not, but I
know I signed that paper there at Lew's.''

Mrs. Frazier testifies at first that she remembers but one
paper and that was a ''paper for guardian over mother'', yet
later concedes that the contract was read over to her in inter-
veners' office before she signed, but that she then protested
she did not understand it. The interveners' testimony is to
the effect that their firm was first interviewed on this business
by Henry Edler, who at that time asked them upon what
terms they would take up the business, saying that he had no
money for that purpose, and asked that they ''take it on
shares''. Interveners at first suggested a contingent fee of
25 per cent, or one fourth, but Edler held out for better terms,
and they finally told him that, if he would get the rest of the
heirs to join, they would perform the service for 20 per cent,
and they finally agreed upon that figure. A few days later,
Henry came back with Frank and Mrs. Frazier, and the three
then signed the contract in interveners' office. They further
testify that the subject of fees and percentage named was

there talked over and fully understood. Mrs. Frazier at first objected that the fee was high, but upon interveners' saying they would otherwise undertake the service only upon the basis of a cash compensation, she joined with the others in executing the contract. None of them said anything about not understanding or being unable to read the paper, and all signed their names without difficulty. To bring the matter to completion, one of the interveners drove out the next day to the home of appellees and saw them all, or nearly all, together, and there three of the heirs, David, Lew and W. P., attached their signatures, saying that they had talked the matter over together and it was all right. Interveners further say that the paper was there read over and the fee of 20 per cent specifically discussed, and that the only objection made to it was by Henry's wife, who was present.

Taking the testimony as a whole, we think it not open to reasonable doubt that the heirs who signed the contract understood its terms, and that they were neither deceived nor misled by the interveners. It is probably true that they did not foresee or expect a marked rise in value of the property during the remainder of their mother's life, and, had they been gifted with the power of prophecy, and known in advance what a 20 per cent contingent fee would amount to when the right thereto would ripen seven years in the future, they might have hesitated or refused to agree to the proposition. Indeed, that is the great burden of their complaint on the trial. Their counsel shrewdly asks each in substance, "If you had then understood that under this contract Crail & Crail would in the end become entitled to a fee of $1,500 to $2,000, would you have signed it?" and, very much of course, each responds with a more or less emphatic negative. But this we must say is not the material question. Interveners are not seeking to recover upon a *quantum meruit,* but upon contract, and, unless it is shown that the contract was obtained by means which would justify the court in setting it aside or ignoring

it, the question whether the fee is large or small or whether the services could have been had from others at a lower price is immaterial. As already said, a man may hold his services, as he holds his farm or his horse, at such price as he sees fit to place upon them. If another person undertakes to purchase either at the value so placed upon it, he must pay according to his contract, and, in the absence of any other defense, he will not be heard to say that the thing purchased was not worth what he agreed to pay for it. *Larned v. City of Dubuque,* 86 Iowa 166. We find that the contract is not shown to have been procured by fraud or undue advantage, and that the defense based upon such ground has not been maintained.

A further point was made in the court below that the interest of the heirs in this land at the date of the contract was an expectancy only, and that a contract with reference thereto is void. In its opinion, the trial court, after noting certain authorities which state the common law rule to be that a mere expectancy is not assignable, reaches the conclusion that in Iowa a merely possible or expectant interest in property is assignable, and that equity will enforce such contract when the expectancy ripens into a vested estate. That rule seems to be well settled in this court. *Jones v. Jones,* 46 Iowa 466; *Betts v. Harding,* 133 Iowa 7; *Mally v. Mally,* 121 Iowa 169. Says Mr. Freeman, in note to *McCall v. Hampton,* (Ky.) 56 Am. St. 335, 344:

4. CONTRACTS: requisites and validity: possible or expectant interest in property: contract for lien: assignment.

"Courts of equity are in the habit of giving effect to assignments of contingent interests and expectancies, whether they are in real or personal property, 'not, indeed, as a present positive transfer, operative *in praesenti,* for that can only be done of a thing *in esse,* but as a present contract, to take effect and attach as soon as the thing comes *in esse'.*"

This proposition has the support of very many cases cited

by the annotator, as well as others not mentioned. That such assignments will be scrutinized with care to see that they are not made the means of fraud or oppression is to be admitted; but if made upon agreements fair in themselves, and for an adequate consideration, they will be upheld and enforced. As we have already reached the conclusion that this contract was fairly made, and upon an adequate consideration, there is no reason why we should deny its enforcement.

III.   In this court, appellees make the further point that the interveners' contract is to be classed with what some of the books denominate "catching bargains", and therefore void.

5. ATTORNEY AND CLIENT: contract for compensation: "catching bargains": "unconscionable agreements".

This is but another phase of the same question considered in the last preceding paragraph. Primarily, a "catching bargain" is a bargain for a loan or payment of money made on oppressive or extortionate or unconscionable terms, between a person having money and another having little or no property immediately available, but having property in reversion or expectancy, and has its more natural classification under the head of usury, 6 Cyc. 702.   It is also sometimes extended to include unconscionable agreements in general with an expectant heir. The rule had its origin in England, and is more applicable to conditions existing there than in this country, although it has occasionally been given recognition by our courts. An unconscionable agreement, as here employed, has been defined as one which, it is apparent from the intrinsic nature and subject of the bargain itself, no man in his senses and not under delusion would make on the one hand, and no honest and fair man would accept on the other. *Chesterfield v. Janssen*, 2 Ves. 154; *Hume v. United States*, 132 U. S. 406; 1 Elliott on Contracts, Sec. 159.   For the reasons already stated, we are of the opinion that this case does not come within the rule of catching bargains.

Nor can it be said to come within that other rule invoked by appellees which makes contracts against public policy

unenforceable.    Cases where this principle has been held applicable to transfers or assignments of ex-

6. CONTRACTS: re-
quisites and
validity: pub-
lic policy:
assignment of
an "expect-
ancy".

pectancies have generally been "those involving champerty, assignments of salaries, pensions and the like". *Bridge v. Kedon,* 163 Cal. 493. This case is not of that character, and, if assignments or pledges of expectations are sustainable in any case, we find nothing in this one to deprive it of recognition by the court. So, too, if the pledge or assignment of an expectancy as security is valid, and such is the clear purport of the great weight of authority, then the right of the heir to provide that his interest when vested shall be subject to the promised lien cannot be doubted. *Dunham v. Bentley,* 103 Iowa 136; *Bridge v. Kedon, supra.*

Further discussion of the case is unnecessary. For the reasons stated, the decree appealed from, so far as it affects the rights of the interveners, is reversed, and cause remanded with directions to enter a supplemental decree for the interveners establishing their claim to receive 20 per cent of six sevenths of the proceeds of the sale of the land in question, with interest thereon from the date of the decree of distribution heretofore entered. Costs will be taxed to the appellees.— *Reversed* and *Remanded.*

EVANS, C. J., DEEMER and PRESTON, JJ., concur.