Ronald HART, et al.

v.

JOSEPH DECOSIMO
AND COMPANY,
LLP, et al.

Court of Appeals of Tennessee,
at Knoxville.

Aug. 18, 2003 Session.

Jan. 30, 2004.

Permission to Appeal Denied by
Supreme Court Oct. 4, 2004.

Michael E. Richardson, Chattanooga, Tennessee, for the appellants, Ronald Hart, Frank Brown, R&F Leasing Company, LP, and ICM Partners, LP.

David L. Hartsell, Chicago, Illinois, and Charles J. Fleischmann, Chattanooga, Tennessee, for the appellees, Joseph Decosimo and Company, LLP, Hendry & Decosimo, LLP, and William Acuff.

## OPINION

CHARLES D. SUSANO, JR., J., delivered the opinion of the court, in which D. MICHAEL SWINEY, J., and WILLIAM H. INMAN, Sr. J., joined.

Ronald Hart, Frank Brown, R&F Leasing Company, LP ("R&F Leasing"), and ICM Partners, LP ("ICM") (collectively "the plaintiffs") sued Joseph Decosimo and Company, LLP, Hendry & Decosimo, LLP, William Acuff (collectively "the accounting defendants"), and other defendants,[1] alleging accounting negligence and gross negligence on the part of the accounting defendants. The trial court granted the accounting defendants summary judgment, holding that the plaintiffs' claims against them were "abrogated" by a settlement in an adversary proceeding filed in the United States Bankruptcy Court in Chattanooga. The plaintiffs appeal, arguing that their claims are separate and distinct from the claims asserted in the bankruptcy proceeding and, thus, are not barred by the settlement in that case. We vacate and remand for further proceedings.

### I. Facts

In late 1995, Leewood Carter, Jr., purchased a marina formerly known as Loret Marina. He renamed it Island Cove Marina & Resort, LLC ("the LLC"). To facilitate the purchase, Carter borrowed $580,000 from the plaintiffs Hart and Brown. Shortly after Carter purchased the marina, Hart and Brown agreed to convert their debt into an equity position in the LLC. They became the majority owners with Carter maintaining a 17% minority ownership interest. Carter was the "Chief Manager" of the LLC and was in charge of the LLC's day-to-day operations.

In November, 1996, Carter, in his capacity as the LLC's Chief Manager, engaged the accounting defendants to assist the LLC in straightening out its books and getting its computer system to produce accurate monthly financial statements. One of the accounting defendants, William Acuff, was primarily responsible for the work to be performed for the LLC.

As a part of their efforts to "close out" the LLC's books for 1996, the accounting defendants prepared a year-end compilation report prepared from financial information obtained from the LLC's management. The compilation report, reflecting a net loss of $428,000, was presented to the LLC's members at a meeting held on February 7, 1997. Subsequent to the preparation of the compilation, the accounting defendants prepared the LLC's 1996 federal

---

1. The plaintiffs settled their claims against the defendants Richard Gilbert and Cornerstone Community Bank. Their claims against the defendants Leewood Carter, Jr. and his wife, Marlene Carter, are still pending. The trial court entered its judgment for the accounting defendants pursuant to the provisions of Tenn. R. Civ. P. 54.02, reciting that there was "no just reason for delay," see id., and directing that the judgment for the accounting defendants was "a final and appealable judgment."

income tax return. The return reflected a similar but slightly larger loss.

The accounting defendants continued to render some services to the LLC. Between September, 1997, and July, 1998, Acuff spent, on average, approximately five hours per week on the LLC's business, providing general accounting and bookkeeper services to the LLC, as needed, as well as preparing the 1997 federal income tax return.

The LLC continued to suffer losses throughout 1997 and 1998, which losses were documented in monthly financial reports generated internally by the LLC's controller. These monthly reports reflect that the LLC lost more than $1 million in 1997 and another $600,000 in the first half of 1998.

After the controller generated the financial reports, she gave them to Carter, who in turn undertook to distribute them to the plaintiffs Hart and Brown. Carter, however, never sent Hart and Brown the actual financials he received from the controller. Rather, beginning in early 1997, before distributing them to Hart and Brown, he began altering the statements to conceal losses and reflect, instead, false profits. On several occasions, Carter simply "whited-out" the loss on the bottom line of the statements and typed in fabricated numbers without regard to whether the numbers even added up. Every month, Carter faxed these altered financial statements directly to Hart and Brown.

Carter also sent Hart and Brown a fabricated 1997 compilation report which purported to be from the accounting defendants. It falsely reflected a profit. On several occasions, Carter fabricated letters and memos that purported to be from lawyers, a banker, and the accounting defendants. By using these documents, Car-

ter deceived Hart and Brown as well as the LLC's creditors.

Carter acknowledged his deception on August 10, 1998, and Hart immediately terminated him. He later pled guilty to one count of bank fraud and was sentenced to 38 months in a federal prison camp.[2]

## II. *Procedural History*

In September, 1998, the LLC filed a petition under Chapter 11 of the Bankruptcy Code in a proceeding styled *In re Island Cove Marina and Resort, LLC,* Case No. 98–15087, in the United States Bankruptcy Court for the Eastern District of Tennessee, Southern Division in Chattanooga. A trustee was not appointed in that proceeding; Hart and Brown were allowed to proceed as debtors-in-possession.

In July, 1999, while the Chapter 11 proceeding was still pending, the plaintiffs filed the instant action in circuit court, alleging that the accounting defendants had committed acts of negligence and gross negligence, and, that, as a result of said conduct, the plaintiffs "ha[d] sustained significant monetary damages." They sued for $3 million in compensatory damages and $5 million in punitive damages.

On August 22, 2000, the LLC filed a Second Amended Plan of Reorganization ("the Amended Plan") in the Chapter 11 proceeding. The plan was signed by Terry Kelly, the LLC's General Manager. It is undisputed that the plaintiffs were aware of and approved the Amended Plan.

On September 13, 2000, the LLC filed a proceeding ("the Adversary Proceeding") against the accounting defendants alleging accounting negligence and gross negligence. It is obvious from a comparison of (1) the complaint in the instant case and

---

2. The defendant, Richard Gilbert, also pled     guilty to federal bank fraud charges.

(2) the pleading filed by the LLC in the Adversary Proceeding, that the drafter of the latter claim copied from the complaint in the state court action. Generally speaking, the only change was to substitute the LLC as the claimant. Other than the suing party, the two pleadings are essentially identical. It should be noted, however, that the claimant's counsel in the two cases are from different firms.

The Amended Plan was confirmed by the Bankruptcy Court on January 10, 2001. An order was entered by that court on May 4, 2001, disallowing the claims filed against the LLC by the plaintiffs R&F Leasing and ICM. The Bankruptcy Judge noted in his order that the claims of R&F Leasing and ICM were, under the Amended Plan, to be treated as "equity" and hence they were disallowed as the claims of creditors.

In November, 2001, the LLC entered into a "Settlement Agreement and General Release" ("the Settlement Agreement in Bankruptcy") with the accounting defendants in the Adversary Proceeding by the terms of which the accounting defendants paid $250,000 to the LLC. In the recitals in the "Settlement Agreement and General Release," there is specific reference to the Adversary Proceeding but no reference to the complaint filed in the instant action. On December 6, 2001, the Bankruptcy Court held a hearing on the LLC's motion to approve the settlement. The plaintiffs initially objected to the settlement; but later in the hearing, they withdrew their objection.

By order entered December 11, 2001, the Bankruptcy Court approved the settlement. In doing so, that court recited as follows:

The motion to approve the Settlement Agreement is granted;

Any and all *claims of the LLC*, for itself, its present and former members, its employees and agents, and its equity interests including but not limited to the Equity Interests identified in Paragraph 2.11 of the Plan, against these Defendants, which were asserted or which could have been asserted in this adversary proceeding *by the LLC*, are DISMISSED with prejudice.

(Paragraph numbering in original omitted) (emphasis added).

### III. *Motion to Dismiss in State Court Action*

On January 3, 2002, the accounting defendants filed a motion in the instant action seeking to dismiss the plaintiffs' complaint. In its motion, the accounting defendants asserted that "the order [in the Adversary Proceeding] approving [the settlement in that matter], specifically released all of the claims asserted [in the state court action]." By memorandum and order entered September 24, 2002, the trial court granted the motion of the accounting defendants, finding that the "[p]laintiffs' claims are barred." The trial court concluded that the claims in the instant action were barred by the doctrine of *res judicata* "in that the claims were extinguished by the settlement agreement in the bankruptcy proceedings brought in the United States Bankruptcy Court for the Eastern District of Tennessee, *Island Cove Marina and Resort, LLC v. Joseph Decosimo and Company, et al.,* Adversary Proceeding No. 00–1164." The trial court observed:

From the plain meaning of the [Bankruptcy Court] documents, this Court can find no other logical conclusion but that the [p]laintiffs['] interests or claims they have attempted to assert in this Court have been abrogated.

From the judgment of the trial court, the plaintiffs appeal. In general terms, they contend that the settlement between the

LLC and the accounting defendants in the Adversary Proceeding does not bar their claims in this state court action.

## IV. *Standard of Review*

The motion to dismiss filed by the accounting defendants essentially asserts that the plaintiffs' complaint fails to state a claim upon which relief can be granted. *See* Tenn. R. Civ. P. 12.02(6). The motion is supported by voluminous material. Accordingly, we treat the motion as one filed pursuant to Tenn. R. Civ. P. 56, *i.e.*, as a motion for summary judgment. *See* Tenn. R. Civ. P. 12.02 ("If, . . . , matters outside the pleadings are presented to and not excluded by the court, the motion shall be treated as one for summary judgment and disposed of as provided in Rule 56.")

Under Tenn. R. Civ. P. 56, "we review the record without a presumption of correctness to determine whether the absence of genuine and material factual issues entitle the movant to judgment as a matter of law." *Finister v. Humboldt Gen. Hosp., Inc.*, 970 S.W.2d 435, 437–38 (Tenn.1998). To be successful, a movant must do one of two things: affirmatively negate an essential element of the complaint or conclusively establish an affirmative defense. *Id.* at 438. The accounting defendants have chosen the latter path of defense.

On summary judgment, we must decide anew if the requirements of Tenn. R. Civ. P. 56 have been met. *Price v. Mercury Supply Co.*, 682 S.W.2d 924, 929 (Tenn.Ct. App.1984). In evaluating the record, we are required to

> view[ ] the pleadings, depositions, answers to interrogatories, admissions, and competent affidavits in a light most favorable to the opponent of the motion. Likewise, all legitimate conclusions from

the record should be drawn in favor of the opponent of the motion.

*Id.*

## V. *The Issue*

The issue before us can be stated thusly: Does the settlement between the LLC and the accounting defendants in the Adversary Proceeding filed by the LLC in the United States Bankruptcy Court (1) entitle the accounting defendants to summary judgment on their defense of *res judicata* or (2) otherwise operate to bar the plaintiffs' claims for accounting negligence and gross negligence?

In order to resolve this issue, we need to look no further than the language of the complaint in the instant action; the deposition testimony of the plaintiff Hart; the Amended Plan filed by the LLC in the Chapter 11 bankruptcy proceeding; and the Settlement Agreement in Bankruptcy.

## VI. *The Complaint*

As particularly pertinent to the issue before us, the complaint filed by the plaintiffs in the instant case contains, *inter alia*, the following allegations:

> R & F Leasing Company, L.P., is a general partnership organized and existing under the laws of the State of Tennessee. Plaintiffs Hart and Brown have partnership interests in R & F Leasing Company, L.P.

> Plaintiff, ICM Partners, L.P., is a limited partnership organized and existing under the laws of the State of Tennessee.

> *       *       *

> In late 1996, plaintiff, Ron Hart, spoke to Joseph Decosimo and Fred Decosimo, partners in the accounting firm of Joseph Decosimo and Company, LLP, about Hart's and Brown's desire to hire their firm to be the "watchdog" for the

majority owners of the LLC with respect to the Chief Manager, Lee Carter and to provide accounting controls for the offsite owners. In January, 1997, plaintiff Ronald Hart communicated with Joseph Decosimo, the senior partner of Joseph Decosimo and Company, concerning the subject of engaging the firm of Joseph Decosimo and Company to perform all professional accounting services needed by the LLC. During these communications, plaintiff Hart indicated to Joseph Decosimo that Hart and Brown were majority owners in the LLC and that Lee Carter simply had a minority interest. Plaintiff Hart specifically engaged Joseph Decosimo and Company, along with its subsidiary, Hendry and Decosimo, to render accounting services to the LLC and further specifically engaged the defendant accountants to monitor defendant, Lee Carter's operation of the LLC. Hart specifically engaged the defendant accounting firms to perform a watchdog function over the LLC and defendant Carter and advise plaintiffs Hart or Brown of any questionable accounting procedures or decisions suggested by defendant Lee Carter. The defendant accounting firms agreed and accepted this engagement, after which time professional fees were paid.

On or about February 7, 1997, plaintiffs Hart and Brown met with defendant, Lee Carter and defendant, William Acuff, in the Dalton, Georgia offices of Hendry and Decosimo. At that time, the members officially voted to hire the defendant accounting firms to audit the LLC's books, file its tax returns, and establish an accounting system that generated and delivered accurate financial data and implemented the appropriate and customary control mechanisms to protect the LLC and its members from embezzlement, theft or other forms of corruption. At this meeting, plaintiffs Hart and Brown specifically asked defendant Acuff to directly mail each member a monthly financial report that showed comparisons to the LLC's annual budget. Plaintiff Hart also reminded defendant Acuff of his role as "policeman" and "watchdog" for the offsite members and majority holders of the LLC, plaintiffs Hart and Brown. Following up on plaintiff Hart's prior conversations with Joseph Decosimo, plaintiff Hart charged defendant Acuff with his obligation to inform the plaintiffs of the financial status of the LLC and of any financial irregularities or self dealing. Defendant Acuff acknowledged his fiduciary obligation to do this. The defendant accountants had been hired de facto in late 1996, but the defendant accountants' engagement and respective duties were officially confirmed at the February 7, 1997 meeting.

Pursuant to its engagement by the plaintiffs, defendants, Joseph Decosimo and Company, LLP, Hendry and Decosimo, LLP and William Acuff (hereinafter referred to as the defendant accountants) undertook and had duties to employ the degree of knowledge, skill and judgment usually possessed by competent members of their profession. The accountant defendants knew that plaintiffs Hart and Brown were engaging them to perform accounting functions, tax functions and also to render consulting and professional advise with respect to the detection of any fraud or irregularities. The defendant accountants further knew that plaintiffs Hart and Brown were relying upon the defendant's future representations as to the manner in which the LLC was being operated, the manner in which the books and records were being maintained and their opinions with respect to the accu-

racy and reliability of financial data and information. The defendant accountants knew the plaintiffs were hiring them, mainly to be the "watchdogs" for the offsite owners and to keep the majority owners apprised as to all accounting functions.

\* \* \*

Plaintiffs Ronald Hart and Frank Brown had established R & F Leasing Company, L.P. for the purpose of constructing and owning docks which would then be leased to the LLC. One dock was initially constructed during the latter part of 1996. Subsequent to the engagement of the defendant accountants, plaintiffs Hart had conversations with Carter and Acuff regarding the operations and profitability of the LLC, as hereinbefore described. In reliance upon the financial data and verbal assurances received by the plaintiffs from Acuff and Carter regarding the profitable nature of the LLC's business, plaintiffs Hart, Brown and R & F Leasing Company, L.P., determined to expend considerable additional monies in connection with the construction of new docks and a drystorage building. The plaintiffs would not have expended the considerable additional sums that they did during the 1997 timeframe, but for the assurances and misrepresentations made to them by Acuff and Carter concerning the alleged profitable operations of the LLC.

\* \* \*

Subsequent to [a meeting on or about November 20, 1997], defendant Carter approached plaintiff Hart with a proposition that Hart should finance boat sales at the Marina to customers with good credit histories. Plaintiff Hart had subsequent conversations with defendant Carter concerning boat financing, after which time Hart carefully reviewed the financial reports generated by Acuff

and the LLC's accounting system which Acuff was supervising. Plaintiff Hart spoke with Acuff about various financial matters at the LLC, including the strong operating profits and cash flows being generated by the LLC, as shown to the individual plaintiffs by defendants Carter and Acuff. Based upon these financial reports and discussions with defendant Acuff, plaintiff Hart determined that the LLC was a thriving business with a good future that presented a good opportunity for a spin-off business venture, and Hart decided to form another company, ICM Partners, L.P., to make loans to the LLC to be used by the LLC to finance boat sales.

\* \* \*

At all times relevant hereto, the plaintiffs looked to Joseph Decosimo and Company, LLP, and Hendry and Decosimo, LLP, to protect their financial interests and advise the plaintiffs of any financial irregularities, accounting irregularities or financial misconduct. This is precisely what the plaintiffs had engaged the defendant accountants to do. At all times relevant hereto, defendant William Acuff, was an employee of defendant Hendry and Decosimo, LLP, which in turn, is alleged to be a subsidiary of defendant, Joseph Decosimo and Company, LLP. The plaintiffs aver and charge that defendants Joseph Decosimo and Company, LLP, and Hendry and Decosimo, LLP are responsible for any misconduct or professional negligence committed by defendant Acuff, under applicable principles of respondeat superior.

In performing their duties as independent certified public accountants for plaintiffs Hart, Brown, R & F Leasing and ICM, LP, defendants Joseph Decosimo and Company, Hendry and Decosimo, LLP and William Acuff failed to

employ the degree of knowledge, skill and judgment usually possessed by competent members of their profession and failed to adhere to generally accepted accounting principles and other pronouncements of the AICPA which pertain to financial disclosures, detection and reporting of fraud and irregularities, independence, integrity and competence. As a direct and proximate result of the defendant's negligence, the plaintiffs have suffered significant monetary damages.

The plaintiffs aver and charge that the defendant accountants were guilty of professional negligence and gross negligence in many respects. Plaintiffs Hart and Brown allege that they relied upon the defendant accountants' negligent misrepresentations in making informed business decisions and judgments. Plaintiffs ICM, LP and R & F Leasing allege they have also suffered significant monetary negligence [sic] because of the negligence and gross negligence of the defendant accountants.

\* \* \* \* ..

■ As a proximate result of defendant accountants' negligence and gross negligence, as hereinbefore described, plaintiffs Hart and Brown have suffered significant monetary losses, including the loss of their original investment in the LLC and in related business investments, along with subsequent substantial amounts of money invested. Furthermore, plaintiffs Hart and Brown have suffered injury to their professional reputations as a proximate result of the defendant accountants' negligence and gross negligence.

Plaintiff, R & F Leasing avers and charges that it has suffered significant financial losses in the approximate amount of $700,000, as a result of the negligence and gross negligence of the

defendant accountants, as hereinbefore described.

Plaintiff, ICM, LP, avers and charges that it has suffered significant monetary damages in the approximate amount of $1,200,000.00, as a proximate result of the defendant accountants' negligence and gross negligence.

(Paragraph numbering in original omitted). In summary, the plaintiffs' complaint alleges that Hart and Brown, acting for themselves and for their related entities, R&F Leasing and ICM, engaged the services of the accounting defendants to perform a "watchdog" function on their behalf with respect to the minority owner and Chief Manager Carter; that the accounting defendants were negligent and grossly negligent with respect to this engagement; and that as a consequence of the negligence of the accounting defendants, the plaintiffs were damaged. On its face, the complaint, construed liberally in favor of the plaintiffs, alleges a cause of action based upon accounting negligence and gross negligence.

## VII. *Deposition Testimony of Plaintiff Hart*

The plaintiff Hart was deposed over two days in September, 2001. He testified to a discussion he had with the defendant Acuff at a meeting on February 7, 1997:

Q: Mr. Acuff testified, and I think you were sitting there, Mr. Hart, that before the meeting started, you came up to him and kind of put your hand on his shoulder and made some comments to him, almost whispered to him as the meeting was started. Do you recall that happening?

A: It was during the meeting, maybe before the meeting that Frank Brown and I called him aside or talked to him directly about what we expected of him.

We reiterated the previous conversation we had had with Joe Decosimo. .

Q: So both you and Frank talked to him together?

A: That's my recollection, Frank was there.

Q: And was this just the three of you talking?

A: I think so, yes.

Q: And tell me what you said to him.

A: We reminded him his role as watch dog for the out-of-town owners, us, and if anything questionable came up always to call us and let us know, any self-dealing, any issues that we were open to direct call at any time and that's what we expected him to do.

Q: Was Mr. Carter—was he there already when you and Mr. Brown had had this private conversation with Mr. Acuff?

A: I don't recall him being there at the time, but perhaps he was.

Q: And what was it that you wanted Mr. Acuff—when you told Mr. Acuff that you wanted him to be the watch dog and watch out for your interests, you were talking about Ron Hart's and Frank Brown's interest, right?

A: I don't think in my mind I delineated at the time the difference. The marina was my interest, R&F Leasing was my interest, an investment in the situation was my interest, so I didn't break it down to him that my interest was partial this way. It's pretty common sense as to what my interests were in the situation.

Q: You were basically asking him to watch out on your partner Lee Carter, is that the gist of it?

A: Watch out my partner Lee Carter, I don't believe I used those words, no.

Q: Well, who was Bill supposed to be watching out for, Mr. Carter?

A: Yes, effectively, because Lee was our manager. He was the chief manager of the LLC with very clear limitations as to what he could do.

Q: You and Mr. Brown made him the chief manager, right?

A: Yes.

Q: In February of '97, did you have some reason to distrust Mr. Carter?

A: I think it's a little bit like Ronald Reagan says, you trust but verify, and I think it was an attempt to make sure that there was an open line of communication between Bill Acuff and us. And if anything funny or odd or quirky went on in terms of something, we wanted to hear about it.

Q: In February of '97, did you have any specific reason to distrust Mr. Carter?

A: No specific incident, no.

Q: I mean, you wouldn't go into business with somebody that you didn't trust, would you?

A: I didn't know Lee Carter, neither did Frank Brown, until he approached us about the marina. And so had I had a history with him and known him for a while, I think I would have been less concerned, but clearly not knowing him I had more concern.

Q: What did Mr. Acuff say to you when you and Mr. Brown—did Mr. Brown say anything during this little meeting, or was it just you?

A: I don't recall who said what.

Q: What did Mr. Acuff say?

A: He acknowledged.

As can be seen, this conversation alluded to Hart's earlier conversation with Joseph Decosimo of the Decosimo accounting firms in which Hart talked to Decosimo about performing a "watchdog" function for Hart, Brown, and their related entities.

■ Under our standard of review of the trial court's grant of summary judgment, we are required to take as true verified facts favorable to the opponent of the motion. *See Byrd v. Hall,* 847 S.W.2d 208, 215 (Tenn.1993) ("The evidence offered by the nonmoving party must be taken as true."). In the instant case, this means we accept as an established fact, at this juncture in the proceedings, that the plaintiffs, based on Hart's dealings and conversations with Joseph Decosimo and the defendant Acuff, established a professional relationship with the accounting defendants as set forth in the plaintiffs' complaint. Certainly, there is evidence before us to the contrary, *i.e.,* evidence showing that the relationship was between the LLC and the accounting defendants and not between the plaintiffs and the accounting defendants. This is bolstered by the fact that the record before us establishes as a fact that all bills rendered by the accounting defendants were paid by the LLC and not by any of the plaintiffs.[3] We freely acknowledge the sharp conflict in the evidence as to who retained the services of the accounting defendants and the nature of the engagement; but on summary judgment, we do not weigh the evidence. Rather, we take as true the evidence and inferences favorable to the nonmovants—in this case, the plaintiffs—and disregard all evidence to the contrary. Hence, we evaluate this case with one fact established—the plaintiffs, acting for their individual interests, retained the services of the accounting defendants to keep an eye on the minority owner Carter and report to the plaintiffs Hart and Brown, and, through them, to the related entities, regarding any untoward conduct on the part of Carter as it related to the financial interests of the individual plaintiffs and their related entities.

## VIII. *The Bankruptcy Documents*

As we previously noted, the LLC filed the Amended Plan in the bankruptcy court[4] with the full knowledge of the individual plaintiffs. It goes without saying that their knowledge is imputed to the other plaintiffs, being entities controlled by one or both of the individual plaintiffs. The purpose of the Amended Plan is clear from the face of that document—to classify and prioritize claims.

The Amended Plan purports to place claims in 12 classes, starting with "Class 1," being "[a]llowed Claims against [the LLC] for administrative expenses allowed under 11 U.S.C. [§] 503(b)" and ending with "Class 12," being "those claims held by [defendant] Carter pursuant to the subordinated repurchase note which has been or shall be executed in order to divest ... Carter of any equity interest in [the LLC]."

In Article II of the Amended Plan, under the heading, "Classification of Claims and Interests," the following preamble is found:

> For the purposes of this Plan, the Claims *against the Debtor* are classified as set forth in this Section. A Claim is in a particular Class and entitled to dis-

---

3. *Cf. Lawrence v. Tschirgi,* 244 Iowa 386, 57 N.W.2d 46, 48 (1953) ("No formal contract is necessary to create the relation of attorney and client. Nor is payment of a fee necessary. The contract may be implied from conduct of the parties."); *Central Cab Co., Inc. v. Clarke,* 259 Md. 542, 270 A.2d 662, 666–67 (1970). While these cases deal with the attorney-client relationship, the principle expressed in them would apply with equal force to the accountant-client relationship.

4. The Amended Plan was filed pursuant to 11 U.S.C. § 1121(a), which provides that "[t]he debtor may file a plan with a petition commencing a voluntary case, or at any time in a voluntary case or an involuntary case."

tribution only to the extent it is an Allowed Claim. A claim that is ultimately disallowed shall not participate in the distribution under the Plan.

(Emphasis added). While "Secured Claims" and "Unsecured Claims" are defined in the Amended Plan, the word "Claim" is not defined other than to the extent it is defined in the above quoted material alluding to "Claims *against the Debtor.*" (Emphasis added).

This brings us to Section 2.11 of the Amended Plan, the section of the Plan relied upon by the accounting defendants to support their motion to dismiss and the specific provision underpinning the trial court's grant of summary judgment. Section 2.11 provides, in its entirety, as follows:

> Class 11 consists of the equity interests in [the LLC]. This Class includes all unsecured claims of Ron Hart, Frank Brown, R&F Leasing Co., L.P., ICM Partners and any business or entity in which Ron Hart and Frank Brown hold any ownership interest, which would otherwise be classified as Class 9 claimants. All such unsecured claims will be treated as equity interests in the [LLC], and will not receive a distribution as Class 9 claims.

## IX. *Parties' Positions*

The position of the accounting defendants is clearly set forth in the summary of argument section of their brief:

> To the extent that the Plaintiffs ever had any claims against Decosimo independent of the claims that were asserted by the LLC (which is denied), those claims became part of the bankruptcy estate by virtue of the Plan. Plaintiffs voluntarily elected, as part of the Plan, to convert their claims to equity in the LLC. They did so at a time when the present lawsuit [in the state court] was

pending, and they were represented and assisted by counsel throughout, both in this case and in the bankruptcy case. After converting their interests into equity, the *LLC* then asserted those claims by filing its own Adversary Proceeding against Decosimo. Those claims were subsequently compromised and settled by the LLC as part of the Settlement. The Settlement was approved by the Bankruptcy Court despite these Plaintiffs' objection to the complete scope of the release, which they withdrew prior to the Court's approval of the Settlement. Thus, whatever claims the Plaintiffs may have *once had* against Decosimo have since been extinguished.

(Emphasis in original). In addition to their argument based upon the doctrine of *res judicata,* the accounting defendants contend that, even if *res judicata* does not apply to the facts of this case, the Settlement Agreement in Bankruptcy, in and of itself, bars the plaintiffs' complaint. They rely upon the following language in that document:

> The LLC, for itself, its present and former members, employees and agents, and its equity interests including but not limited to the Equity Interests identified in Paragraph 2.11 of the Plan, hereby releases and discharges forever Decosimo, and all of Decosimo's present and former affiliates, partners, associates, assigns, successors, insurers, lawyers, partnership entities, principals, employers, employees, agents, attorneys, personal representatives, spouses, executors, administrators, heirs and estates, or any other person, company or entity asserting an interest by or through Decosimo, from any and all *claims of the LLC* which were asserted or could have been asserted in the Adversary Proceeding by the LLC. As part of this release, the LLC represents and warrants that it

has not assigned, conveyed or otherwise transferred any claim that it has or may have had against Decosimo.

(Emphasis added). They argue that, by this language, the LLC released the plaintiffs' individual claims being asserted in the state court action.

The plaintiffs contend that Section 2.11 of the Amended Plan does not have the effect of converting their *individual claims against the accounting defendants* into equity in the LLC; that the claims in the Adversary Proceeding are the claims of the LLC and not the individual claims of the plaintiffs asserted in the instant action, thus rendering the defense of *res judicata* inapplicable to their individual claims; and that the General Manager of the LLC, in signing the Settlement Agreement in Bankruptcy, had no authority to settle their individual claims against the accounting defendants.

## X. *Discussion*

### A. Section 2.11 of the Amended Plan

The Amended Plan, by its express language in Article II, deals with "[c]laims against the Debtor [*i.e.*, the LLC]." Section 2.11 of the Amended Plan addresses the classification of "all unsecured claims of Ron Hart, Frank Brown, [R&F Leasing], and [ICM] and any business or entity in which Ron Hart and Frank Brown hold any ownership interest, which would otherwise be classified as Class 9 claimants." According to the plain language of Section 2.11, all such "unsecured claims" are converted into equity and, hence, lose their character as debt.

■ The accounting defendants argue that the word "claims" as used in Section 2.11 encompasses the plaintiffs' individual claims against the accounting defendants. This position flies in the face of the language of Article II, which clearly indicates

that the Amended Plan deals with *claims against the LLC*. If, as they allege in their state court complaint, the plaintiffs have a cause of action against the accounting defendants, how can it be argued that *individual claims against the accounting defendants* are included within the concept of *claims against the LLC?* There is nothing in the Amended Plan, expressly or by implication, indicating that the plaintiffs' individual claims against the accounting defendants were intended to be included in the Section 2.11 classification of debt as equity. The language of the Amended Plan does not permit such an interpretation. In fact, the language in Article II of the Amended Plan is directly contrary to such an interpretation.

### B. Res Judicata

■ The doctrine of *res judicata* applies to a situation where there are two claims "involving the same claim, demand or cause of action." *Richardson v. Tennessee Bd. of Dentistry*, 913 S.W.2d 446, 459 (Tenn.1995); *see also State v. Crawford*, 39 S.W.3d 172, 178 (Tenn.Ct.App.2000), *perm. app. denied.*

The LLC settled its claims against the accounting defendants in the Adversary Proceeding in Bankruptcy. The complaint in the instant case and the facts favorable to the plaintiffs establish, at this stage of the proceedings, that the claims now before us are the individual claims of the plaintiffs. The plaintiff Hart's testimony establishes the plaintiffs' individual relationship with the accounting defendants. It may be that the plaintiffs will be unable to convince the trier of fact on this subject. It also may well be that the proof will preponderate against the plaintiffs' theory of claims separate and apart from the claims of the LLC; but, for now, the complaint and the facts favorable to the plaintiffs show a separate engagement by the

terms of which the accounting defendants were to act as a "watchdog" for the plaintiffs while, at the same time, performing their accounting functions under the engagement by the LLC.[5] It is important to remember that, under the facts of this case, these are not mutually exclusive concepts.

■ There are disputed material facts before us as to (1) whether the plaintiffs engaged the accounting defendants for services separate and distinct from those to be rendered pursuant to the engagement by the LLC; (2) the nature of the separate engagement, assuming one existed; (3) whether the accounting defendants were negligent or grossly negligent in performing under the separate engagement, if one did exist; and (4) the nature and extent of the damages suffered by each of the plaintiffs as a result of the negligence, if any, of the accounting defendants. These genuine issues of material fact preclude a grant of summary judgment to the accounting defendants on their affirmative defense of *res judicata.*

### C. The Settlement

The accounting defendants argue that, even if *res judicata* does not apply, the Settlement Agreement in Bankruptcy operates as a complete bar to the plaintiffs' claims in the instant case. There are several reasons why this argument is not persuasive.

■ At the outset, it should be noted that while the Settlement Agreement in Bankruptcy specifically refers in its recitals to the Adversary Proceeding, it makes no reference of any kind to the then-pending state court action. Furthermore, the plaintiffs are not named parties to the Settlement Agreement in Bankruptcy and did not personally sign the document. It is true that the Settlement Agreement in Bankruptcy does quote Section 2.11 of the Amended Plan verbatim in the recitals and refers to it a number of times in the body of the agreement itself; but, as we have attempted to show, this provision has absolutely nothing to do with the plaintiffs' individual claims against the accounting defendants.

Finally, the accounting defendants point out that under the heading "Release of Claims against Decosimo," the LLC purports to release the accounting defendants not only for itself but also for the "[e]quity interests identified in Paragraph 2.11." This is true, but it does not establish the point that the accounting defendants are trying to make. It is of critical importance to note that the document reflects that the release is as to the "claims of the LLC." Based upon the record before us, we are not dealing in the instant action with the "claims of the LLC." Rather, we are dealing with the individual claims of the plaintiffs.

As the record now stands, interpreted as we are required to do under the summary

---

5. The Supreme Court has adopted *Restatement (Second) of Torts* § 552 as "the appropriate standard for actions by third parties against accountants based on negligent misrepresentation." *Bethlehem Steel Corp. v. Ernst & Whinney,* 822 S.W.2d 592, 595 (Tenn. 1991). The court noted that liability to third persons "is limited to those persons or class of persons, as determined by current business practices and the particular factual situation, whom the accountant at the time the report is published should reasonably expect to receive and rely on the information." *Id.* at 596. Even if the plaintiffs in the instant case cannot establish that they *individually* engaged the services of the accounting defendants, such a failure would not preclude them from attempting to show liability under the rubric of *Bethlehem.* Having found evidence of an individual engagement, we do not find it necessary to determine whether the record now before us shows potential liability under *Bethlehem.*

judgment standard, the Settlement Agreement in Bankruptcy is not a bar to the plaintiffs' claims in the instant case.

## XI. *Conclusion*

The judgment of the trial court is vacated. Costs on appeal are taxed to the appellees, Joseph Decosimo and Company, LLP, Hendry & Decosimo, LLP, and William Acuff. This case is remanded for further proceedings.